F. R. Ingram and Mayme T. Ingram v. Commissioner.
Ingram v. Commissioner
Docket Nos. 76887, 86245.
United States Tax Court
T.C. Memo 1961-277; 1961 Tax Ct. Memo LEXIS 78; 20 T.C.M. (CCH) 1447; T.C.M. (RIA) 61277; September 29, 1961
F. R. Ingram, pro se, 900 Farley Bldg., Birmingham, Ala., and W. E. Prescott III, Esq., for the petitioners. Frederick T. Carney, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: In these consolidated proceedings, respondent determined deficiencies in petitioners' income taxes for the taxable years and in the amounts as follows: Docket
No.
Year
Deficiencies
76887
1955
$56,030.30
86245
1956
6,948.03
86245
1957
141.75
*80 Respondent by amended answer claimed an increased deficiency of $887.62 for the taxable year 1957. Certain issues originally raised by the pleadings have been conceded by each party leaving for decision the following: (1) Whether petitioners sustained a theft loss in 1955 in connection with the guaranty of certain notes; (2) Whether certain losses sustained by petitioners during the taxable years here involved were incurred in a trade or business which petitioners contend consisted of promoting, organizing, forming, managing and financing business enterprises; (3) Whether interest paid by petitioners in 1955 in the amount of $3,948.96 is deductible as a business expense; (4) Whether petitioners are entitled to a deduction for automobile expenses in 1955, 1956, and 1957 in an amount in excess of that allowed by respondent; (5) Whether petitioners received ordinary income from the forfeiture by Basil Autrey of his option to purchase stock owned by petitioners; (6) Whether petitioners received ordinary income in 1955 from the transfer of an insurance agent's contract with an insurance company; and (7) Whether petitioners received ordinary income in 1955 from rents from rental *81 property, the legal title to which had been transferred to petitioners' wholly owned corporation. Findings of Fact F. R. Ingram and Mayme T. Ingram, husband and wife, residing in Birmingham, Alabama, filed a joint Federal income tax return for each of the years 1955, 1956, and 1957 with the district director of internal revenue at Birmingham, Alabama. Mayme T. Ingram is joined in these cases only by reason of having filed joint tax returns with her husband. F. R. Ingram will be referred to hereinafter as petitioner. Petitioner is a practicing attorney in Birmingham, Alabama. In 1933 petitioner began the practice of law in Albertville, Alabama, and in 1935 moved to Birmingham and opened a law office there. He has continued his law practice in that city to the present time. Over the period from 1933 up to 1957 petitioner has participated in a number of business ventures. 1. Theft Loss About 1945 petitioner began giving financial assistance to E. F. Ogburn, his wife's uncle and the father of W. E. and R. P. Ogburn, in connection with several business undertakings. One of these was an individual proprietorship of E. F. Ogburn known as Ogburn Roof Products Company. In 1947 petitioner *82 joined with E. F. Ogburn and his sons, W. E. and R. P. Ogburn, to organize and incorporate Ogburn Roof and Painting Company, hereinafter referred to as Ogburn Co., with capital stock of $2,000. Twenty shares of stock were issued of which petitioner owned four shares and his law office secretary, F. H. Cashatt, owned one share. Petitioner lent $500 each to W. E. and R. P. Ogburn for the purchase of their stock and E. F. Ogburn contributed machinery and equipment for his share. The Ogburns each owned five shares of stock in the Ogburn Co.
Petitioner was secretary and a director of the corporation. Petitioner's secretary, F. H. Cashatt, was treasurer of the corporation. The checks of the corporation were signed by W. E. Ogburn and F. H. Cashatt jointly, and the books of the corporation were kept in petitioner's law office and he had access to them at all times. Ogburn Co.'s books were kept on the cash basis and its income tax returns were filed on the cash basis. A record of accounts receivable was maintained but such accounts were not given effect as income in the books or the corporation tax returns until collections were received. Ogburn Co. was engaged in painting contract *83 work with some of the large steel and mining industries of the Birmingham area. W. E. Ogburn handled the bids made by the Ogburn Co. and made up the estimates of work completed on large contracts. From these estimates he supplied the figures for preparing statements of accounts receivable and turned in a weekly list to the Ogburn Co. business office which was located in petitioner's law office. Prior to December 1955 no one checked W. E. Ogburn's figures to determine whether they truly represented the correct amount of accounts receivable. Over a period of years petitioner lent at various times a total of $50,000 to the company all of which was repaid to him by that company. In general, Ogburn Co. financed its operations by borrowing money from the First National Bank of Birmingham. W. E. Ogburn prepared assignment notes which were carried together with statements of the accounts receivable to the bank by petitioner or F. H. Cashatt. The company pledged as collateral its accounts receivable with the bank in return for loans made to meet payroll expenses. The bank required the endorsement of petitioner as guarantor of the notes of the Ogburn Co. Petitioner deposited property with *84 the bank as collateral for various loans made to him personally as well as those made to the Ogburn Co. on his endorsement. Some notes were endorsed by F. H. Cashatt, petitioner's secretary, alone, although she had pledged no collateral with the bank as security for her endorsement. The bank looked to the Ogburn Co. for payment of the notes although in the last year of operation the amounts loaned would not have been justified without the guaranty of petitioner plus his collateral pledged. During the last half of 1955, the bank examined the Ogburn Co. loan account and determined that the accounts receivable assigned to the bank as collateral were overstated. The vice president of the bank in charge of the account had a conversation with petitioner and told him it was doubtful that the volume of work done by Ogburn Co. was of the proportions as reported to the bank. Furthermore, petitioner was told that it was doubtful that the receivables due from Tennessee Coal & Iron Division of U.S. Steel Corp. (T.C.I.) and Republic Steel were correct as shown. Shortly after this conversation with the bank officer, petitioner informed W. E. Ogburn of the nature of the conversation, and advised *85 him that the bank would be able to find out the correct amount of receivables from the two largest debtors, T.C.I. and Republic Steel. Petitioner asked W. E. Ogburn to obtain the correct records of receivables so that they could be taken to the bank. In reply, W. E. Ogburn claimed that he was in the process of negotiating new contracts with the companies in question, and inquiries of them at that time might cause him to lose the contracts to competitors, and moreover, that the accounting departments of those two companies would not have the correct figures since they lagged behind the completed work. Petitioner conferred with the bank officer who advised petitioner that he could determine the correct amount of the accounts receivable from the two companies without disturbing the Ogburn Co.'s relations with those two companies. Petitioner granted permission to the bank to make this inquiry. A day or two later, in the last week of November 1955, the banker called petitioner to the bank and demonstrated to him that the amount actually owed Ogburn Co. by the two companies could not exceed $20,000 to $30,000. According to the records in petitioner's office the Ogburn Co. had accounts *86 receivable from those companies in excess of $100,000. The bank officer advised petitioner that Ogburn Co. was in bad financial condition and that the bank was relying on petitioner for payment of the loans outstanding. When confronted with this information W. E. Ogburn confessed that he had falsified the accounts receivable to some extent but stated that the companies owed substantially more than the figures obtained by the bank and that the bank would not be able to ascertain the correct amount due. About December 1, 1955, petitioner was advised by the bank that the method of handling the loans to Ogburn Co. would have to be changed. Petitioner was given the choice of paying the Ogburn Co.'s indebtedness or of depositing $100,000 in Treasury bills as collateral to cover his guaranty of the Ogburn Co.'s loans. On December 1, 1955, the bank purchased Treasury bills in the face amount of $100,000 for $99,405 to be delivered to the loan and discount department of the bank to be held as collateral. By his check dated December 2, 1955, petitioner paid the bank for these Treasury bills. About December 15, 1955, petitioner paid $74,887.50 for United States Treasury bills in the face *87 amount of $75,000 due January 12, 1956, to be delivered to the bank as collateral. Petitioner retained no control over the Treasury bills after turning them over to the bank as collateral. The purpose of the deposit of the Treasury bills was to assure the bank which at that time also had other collateral pledged by petitioner of an ample amount of collateral to cover petitioner's entire exposure to the bank, including personal debts, endorsed debts and guaranteed debts which totaled on July 7, 1955, $258,321.50. The bank continued to allow the Ogburn Co. to attach its assignment of accounts receivable to the notes; however, the bank was looking primarily to petitioner for payment in case of default. Petitioner was suspicious of the outflow of money of Ogburn Co. and continued to check into the matter of the erroneous list of Ogburn Co.'s accounts receivable and of Ogburn Co.'s expenditures. He was unable to detect any padding of the payroll and found no evidence that W. E. Ogburn had falsified the payroll accounts. At the time petitioner checked for payroll padding, W. E. Ogburn knew petitioner was making the check. Petitioner discovered that W. E. Ogburn had used some paint *88 belonging to Ogburn Co. and had some work done on his personal residence by employees of the company without paying the company for such materials and labor. No criminal charges were ever preferred against W. E. Ogburn. W. E. Ogburn, E. F. Ogburn and petitioner each drew a salary of $150 per week from Ogburn Co. Sometime prior to the summer of 1955 petitioner had suggested to W. E. Ogburn that if the business of the company did not improve, perhaps all three of these salaries should be reduced or eliminated for a period of time. E. F. Ogburn, who was crippled, was furnished a car and chauffeur by Ogburn Company. Petitioner had little to do with the management and operation of the Ogburn Co. W. E. Ogburn prepared the bids on prospective contracts and in general supervised the operation of the business. Petitioner's law office employees kept the books of the Ogburn Co. and typed the statements to be presented to customers from handwritten drafts prepared by W. E. Ogburn. W. E. Ogburn kept bids, contracts, and invoices in his briefcase. These later became unavailable to petitioner and in order to ascertain the debts actually due Ogburn Co., petitioner in 1956 or 1957 filed suit *89 against at least three companies to obtain their records. When obtained, the records showed that the Ogburn Co.'s books were correct as to those amounts and that the money paid by the companies sued had been mailed to and received by the Ogburn Co.
Petitioner also filed a civil suit on behalf of the Ogburn Co. against each of the Ogburns individually. Although the suit was filed in 1956 or 1957 it has been continued and has never been concluded. The Ogburn Co. had borrowed money from the bank almost every week or two on the basis of the accounts receivable and from time to time these notes were consolidated and renewed when necessary. After December 1955 there were no further weekly loans and the notes were consolidated. On December 16, 1955 there was a note in the amount of $76,471.89. This was increased to $81,271.89 and was subsequently reduced by partial payment to $63,093.41 on February 10, 1956. On March 6, 1956, the loan was increased to $81,000 and on June 2, 1956, the loan balance was $61,502.32 at which time the Ogburn Co. loan account was closed by charging that amount to petitioner's account. After the first part of December 1955, the business of the Ogburn Co. was *90 conducted under the direction of William E. Prescott III, counsel for petitioner herein and a law associate of petitioner's. Approximately $19,000 was realized in 1956 from the operation of Ogburn Co. and petitioner reported that amount as income in the year 1956 as a recovery of a portion of the amount of $61,502.32 claimed by him in 1955 as a loss. The Ogburn Co. ceased to do business in the fall of 1956. Petitioners filed their income tax return for 1955 on October 1, 1956 (an extension having been granted to October 15, 1956) and in Schedule C thereof, claimed $61,502.32 as a deductible business loss from advances to Ogburn Roof and Painting Co., Inc. Respondent in his notice of deficiency disallowed the claimed deduction. In his final Amendment to Original Petition as Last Amended which was filed on December 5, 1960, after the trial of this case had been completed, the only allegation as to why the disallowance of the Ogburn Co. loss was erroneous was the following: "For the reason that the Ogburn loss was a theft under the law which Petitioner F. R. Ingram discovered in 1955." 2. Claimed Business Losses a. Harbin Loss Petitioner first became acquainted with John Ed *91 Harbin about 1947 when Harbin invested $20,000 in Drive-in-Theatre Operators, Inc., of Knoxville, Tennessee. Sometime later, on Harbin's request, petitioner bought Harbin's entire stock interest in that company. About 1951 or 1952, Harbin sought petitioner's financial backing in the pipeline business. Petitioner told him that he would not back him in something that Harbin knew so little about, but that if he would obtain some experience in the pipeline business he would "go along with him." About 2 years later Harbin returned and told petitioner that he had learned the business and that he wanted to bid on a pipeline installation at Hartselle, Alabama, to increase the size of the water plant in that city. Harbin stated that he had between $7,000 and $15,000 of his own money and asked petitioner if he would put in $7,000 with him or let him have $7,000 and he would obtain a license and bid on the job. Harbin, doing business as Harbin Pipeline Company, obtained the bid for the Hartselle job and received $7,000 from petitioner. Harbin Pipeline Company, as such, operated from about January 1955 to June or July of 1956. The company made back its expenses and neither gained nor lost an *92 appreciable amount on the Hartselle job. Petitioner had become involved in the operation of the Aggregate Limestone Company, Inc., hereinafter sometimes referred to as Aggregate, which produced products that required hauling by truck. Harbin used the money he had after completing the Hartselle pipeline job for purchasing trucking equipment. Petitioner obtained a hauling contract or agreement for Harbin to haul limestone quarried and crushed by Aggregate. Petitioner advanced Harbin $5,000 on February 27, 1956, to use in the trucking business and Harbin purchased two trucks. Petitioner later loaned Harbin $1,500 to use in the trucking business. The trucks did not stand up under the heavy strain of hauling from 10 to 15 tons of quarried limestone each trip. One of the trucks was worn out in the business and the other was involved in a wreck which completely demolished it, ending Harbin's venture into the trucking business. At that point Aggregate owed Harbin $6,890.11 for services performed in trucking limestone. The company was in financial difficulties and paid Harbin only $3,000. Harbin divided that sum with petitioner, repaying the $1,500 that he had borrowed and retaining $1,500 *93 for himself. Harbin gave petitioner whatever rights he had in the $3,890.11 balance owed him by Aggregate. Petitioner did not recover the $7,000 advanced in connection with the pipeline business nor the $5,000 advanced in connection with the trucking business except to the extent of the $3,890.11 due Harbin by Aggregate assigned to him. Petitioner expected the return of the $7,000 advanced for the pipeline project but Harbin's view of the transaction was that in his opinion he did not owe petitioner any money after the conclusion of the trucking venture. At the end of 1956 Harbin was without funds and a judgment against him could not have been collected at that time. Harbin had been in business continuously since the failure of the trucking business and later owned stock in a concrete business called Gadd-Harbin, Inc. Harbin sold his stock in this business about 1959 or 1960 and realized a profit of $47,000. Petitioner has not instituted any legal actions to recover from Harbin any part of the $12,000 advanced to him. Petitioners on their income tax return for 1956 claimed a deduction in the amount of $12,000 as a "Loss on Taxpayer's enterprise known as Harbin Pipe Line - *94 promoted and financed by John E. Harbin and Taxpayer in 1955 and 1956." Respondent in his notice of deficiency disallowed the claimed deduction. b. Hypoterra Corporation Loss In 1955, through another lawyer, W. F. Spencer, petitioner became interested in a garden watering tool or device on which Charles Wegelin had a patent pending. The interested parties decided to go into business and market the device and petitioner drew up the necessary papers for incorporation under the name Hypoterra Corporation, hereinafter sometimes referred to as Hypoterra, advanced $2,100 of his money as a capital contribution and issued stock certificates. However, the papers were never filed and the corporation never had more than a de facto existence. W. F. Spencer agreed to take over the promotion of the device if petitioner would employ a secretary to assist in the promotional work. Petitioner did hire a secretary, put her on his law office payroll and many letters were written in an effort to promote the device. It developed in 1956 that Montgomery Ward already had a similar device on the market and the interest of the parties in the promotion of the device waned in that year. As a consequence, *95 Hypoterra ceased promoting its device in November of 1956, paid its remaining debts in that month, and abandoned all efforts to sell its garden watering tool. The company had a bank account of $413.99 at the end of 1956. The last transaction in the bank account occurred when petitioner withdrew $400 from the account on October 10, 1957. The balance of $13.99 was still on deposit at the date of trial of this case. Petitioners on their income tax return for the calendar year 1956 claimed a "Loss in Taxpayer's enterprise known as the Hypoterra Corporation (which never incorporated) promoted and financed by Taxpayer in 1955 and 1956" in the amount of $2,100. Respondent in his notice of deficiency disallowed this claimed deduction. The $400 recovered by a withdrawal from Hypoterra's bank account on October 10, 1957, was included by petitioners in law office receipts on their income tax return for the calendar year 1957. Respondent in his notice of deficiency for 1957 determined that the $400 represented a recovery of money loaned and allowed the $1,700 remainder of petitioner's $2,100 investment therein as a capital loss from stock which became worthless in 1957. c. Vogue School *96 of Charm Loss About 1954 petitioner was approached by Annie L. Whitten about financing her in a charm school and agreed to let her have the money to go forward with the Vogue School of Charm provided she would rent space in the Mars Building in Birmingham in which his wife owned an interest. Petitioner contemplated that if the business was successful a corporation would be formed and he would purchase as much as one-half of its stock. This business continued over a period of about 3 years, and on March 1, 1956, he had advanced the amount of $3,192.21. Petitioner made no further advances after March 1, 1956. At the time of the last advance by petitioner, Annie L. Whitten had persuaded him that the business would earn money by the summer of 1956 if she could keep it going and that she would then repay him for the advances. In the summer of 1956 petitioner attempted to collect some amounts on the advances. When he was unable to collect, he treatened to sue and have the landlord take over the premises. During the first part of 1957 petitioner secured a promise from Annie L. Whitten to pay $1,000 in full settlement of the $3,192.21 debt with $500 down and $25 a month. She paid the $500 *97 but defaulted on the monthly payments so petitioner brought suit against her and in August 1957 collected the additional $500. On their 1956 income tax return petitioners claimed a "Loss on taxpayer's enterprise known as Vogue School of Charm promoted and financed by taxpayer during 1955 and 1956," in the amount of $2,192.21. Respondent in his notice of deficiency disallowed the claimed deduction for 1956 and allowed the amount as a nonbusiness bad debt in 1957. d. Aggregate Limestone Company Loans In 1954 R. H. and S. H. Parsons located an old limestone quarry near Birmingham with a large stockpile of 500,000 to 1,000.000 tons of limestone which had already been mined. They asked petitioner to let them have some money with which to operate and he advanced about $20,000. S. H. Parsons left the business and petitioner advanced more money to R. H. Parsons and took notes for the money advanced on each occasion. Aggregate Limestone Company, Inc., was incorporated about 1956 and assumed the obligations of S. H. and R. H. Parsons. Petitioner owned no stock in Aggregate although he had an agreement with R. H. Parsons that he could purchase up to one-half interest at any time. Petitioner *98 assisted in the operation of the company in various ways such as negotiating contracts and making credit arrangements for financing the company. Petitioner personally loaned Aggregate a total amount of $165,456.09 by means of some 75 checks in the years 1955 through 1957. Petitioner also endorsed or guaranteed 29 notes of Aggregate to a bank in the years 1955 to 1958 in a total amount of $166,959. At no time, however, did the total debt of Aggregate guaranteed or endorsed by petitioner exceed $41,000. During most of the period the debts guaranteed or endorsed were much smaller in amount. Petitioner negotiated a contract with Harbert Construction Company to furnish crushed limestone according to certain specifications for runways at the Birmingham Municipal Airport. A great deal of trouble was encountered in mixing the crushed stone in the exact proportions required under the contract specifications and petitioner and his law office associates had to spend most of their time for a month with the company in order to solve the problem. The financial condition of Aggregate worsened and eventually petitioner foreclosed on his mortgages. In 1957 the assets were purchased by petitioner's *99 wife for $10,000 although they were worth far in excess of that amount. Petitioner's wife soon sold all of the assets of Aggregate to A. E. Burgess who put more money in the corporation and made a success of it. Burgess later purchased the interest of R. H. Parsons. Petitioner was to have been placed on the payroll of Aggregate at a salary of $60 a week and was to have received interest on his money but he was not paid either a salary or any interest. On his 1957 return petitioner reported a loss of $181,583.81 arrived at by reducing the amount of $191,583.81 stated to be the balance due "* * * by reason of loans secured by certain mortgages, copies of which are attached hereto" by the $10,000 realized at the foreclosure sale where the assets of the corporation were purchased by petitioner's wife. Respondent in his notice of deficiency disallowed the deduction claimed for this loss but allowed a capital loss of $10,529.60 computed as follows: Net amount of investment
$161,279.60
Fair market value of mortgaged
equipment received
150,750.00
Loss on foreclosure
$ 10,529.60
Petitioner in his Amendment to Original Petition as Last Amended, filed with *100 the Court on December 5, 1960, after the trial of this case, has agreed with the respondent's determination that the net amount of his investment in Aggregate was $161,279.60 and that the net loss in connection with Aggregate is $10,529.60. Petitioner contends that the loss in the amount of $10,529.60 is a business loss or a business bad debt. e. Other Business Ventures In addition to the five business enterprises in respect to which petitioner suffered losses in the taxable year here at issue, from 1933 through 1957 petitioner was involved in a number of other business ventures. A summary of the nature of 15 of these enterprises covering the years 1941 through 1957 and in some instances subsequent years and the extent of petitioner's participation therein follows: In 1946 petitioner helped organize a drive-in theater in Birmingham, Alabama. The enterprise was incorporated and named B.F.I. Amusement Co., Inc. Petitioner made a capital contribution of $2,500 for which he received stock and loaned the corporation a total of $11,783.40. In addition, petitioner, together with two business associates, guaranteed a note of the corporation in the amount of $20,000. Petitioner served *101 as a director and secretary of the corporation, received a small salary as an employee and handled the financial accounts of the corporation, which included writing of checks, paying the employees of the corporation, and paying the bills of the corporation. Petitioner sold his stock in B.F.I. Amusement Co., Inc., in 1952 and realized a gain of $20,617.28 which he reported on his income tax return as a long-term capital gain. In 1946 or 1947 petitioner organized a corporation known as Drive-in-Threatre Operators, Inc., to operate a drive-in theater in Knoxville, Tennessee. Petitioner contributed $10,040.59 as capital, together with several other individuals, and a theater that cost about $135,000 was erected. Petitioner loaned the corporation a total of $12,000 and guaranteed four loans of the corporation in the total amount of $65,237.32. Petitioner acted as secretary of the corporation and was paid a salary for his services in keeping the books of the corporation. Petitioner helped promote the corporation and together with a person named Barnes financed it. In 1952, petitioner sold his stock at a profit of $14,000 which he reported on his income tax return as a long-term capital *102 gain. About 1949 petitioner bought land in Childersburg, Alabama and together with several other individuals organized Corinthian Outdoor Theatre, Inc. Petitioner made a capital contribution of $11,040, and loaned the corporation a total of $10,030.59, and guaranteed one note of the corporation in the amount of $5,000. Petitioner kept the books of the corporation, handled the money, and maintained the corporate records in his office in Birmingham. Petitioner supervised the construction of the theater. Petitioner sold his stock in Corinthian Outdoor Theatre, Inc., at a loss in the amount of $4,386.35 which he reported on his income tax return as a long-term capital loss. Petitioner participated in the active management of each of the three drive-in theater corporations. In 1946 petitioner organized the Abstract Co. of Alabama, Inc., together with Jack Rawls, after having operated as a joint venture. Petitioner had been accumulating abstract records for 6 or 8 months prior to the formation of the corporation. Petitioner contributed approximately 50 percent of the capital of the corporation in the amount of $14,717.19. Petitioner was a stockholder, secretary-treasurer of the corporation, *103 and acted in general as the manager of the corporate business. He designed cards for use in making records, hired employees, kept the books, purchased materials, and supervised the use of photographic equipment in the business of the corporation. Petitioner sold his stock in 1947 at a profit of $2,500 which he reported on his income tax return as a long-term capital gain. In 1951 petitioner planned to develop a subdivision of land known as the Ingram and Parsons Addition to Homewood as a partnership with several individuals. After petitioner had purchased land, his prospective partners decided not to participate in the venture. Petitioner developed the land as a sole proprietor and made a capital investment in the amount of $32,290.88. At the date of trial of this case, he had realized a profit of $9,869.51 on this enterprise. Petitioners on their income tax return for 1955 reported a long-term capital gain from the sale of lots in the Ingram and Parsons Addition. Respondent determined that the gain from the sale of such lots was ordinary income and petitioners accepted this determination. On their income tax return for 1957 petitioners reported a long-term capital gain from sale *104 of lots in the Ingram and Parsons Addition in the amount of $7,123.20. Respondent in his notice of deficiency adjusted the amount of gain to $6,123.20, which amount he determined to be long-term capital gain. At the trial the parties agreed that the gain in the amount determined by respondent was ordinary income to petitioners. In 1955 petitioner and a man named Fontana purchased land in Florida known as Tarpon Springs lake frontage. Petitioner and his partner did some preliminary work in preparation for a subdivision, and in 1956 sold the land to an individual who subdivided the property. Petitioner realized a gain on this transaction which he reported as a long-term capital gain on his income tax return. In 1955 petitioner and Fontana organized a partnership, together with 3 other persons, to develop and promote an area of Florida called Coquina Beach. The partnership bought three separate tracts of land, subdivided a portion of those three tracts, dug a boat canal, and installed streets, water and electricity. Petitioner played an active part in the management and development of this subdivision. Petitioner made a capital contribution in the amount of $13,294.75, loaned the *105 partnership $1,800, and at the date of trial had realized a gain of $6,076.38 which he has reported as ordinary income on his income tax returns for years subsequent to those here involved. In 1949 a joint venture composed of petitioner and several other individuals took title to the Mars Building in Birmingham, Alabama. Petitioner contributed $11,350 to this venture. In 1956 the real estate was sold at a profit and petitioner reported his share of such profit in the amount of $2,356.25 as long-term capital gain. In 1953 petitioner acquired all the stock of the Service Life and Health Insurance Co. for $1,000. Petitioner made capital contributions in the amount of $19,100. Petitioner acted as general manager and was general agent of the corporation, had charge of all the agents and in general performed services for the corporation of a management nature. In 1957 petitioner sold his stock at a loss of $10,100, which he reported on his income tax return as a long-term capital loss. In 1949 petitioner and four other persons organized the National Union Life Insurance Company. Petitioner served as president of the corporation and as a director and later as vice president. Petitioner *106 acted generally in a management capacity in the corporation and spent approximately 25 percent of his time in work connected with its development. Petitioner made a capital contribution of $11,350 and advanced a loan of $1,500 to the corporation. As income in salaries and fees petitioner received $16,393.85. On the sale of his stock in 1953 petitioner realized a loss of $350. In 1947 petitioner helped organize the Professional Life Insurance Company. Petitioner contributed $380.80 as a capital contribution and loaned $999.60 to one of the incorporators in order to furnish him with funds to buy the stock from the corporation. Petitioner was a director of the corporation and was the first president. During the period in which petitioner was associated with the corporation he received $1,739.39 in salaries and fees. Petitioner sold his stock about 1950. About 1944 petitioner acquired stock, together with two business associates, in United American Insurance Company, a corporation which was then in financial difficulty. Petitioner acted as secretary and a director of the corporation and attempted to revitalize the sales of the insurance company. Petitioner made a capital contribution *107 of $4,167, loaned the corporation $2,500 and in 1946 sold his stock therein at a gain which he reported as long-term capital gain. In 1941 petitioner became associated with the Union Life Insurance Association, a fraternal benefit society. Petitioner planned to rehabilitate this life insurance company and eventually merge it with other life insurance companies. Petitioner was successful and in 1943 arranged for the merger of the Union Life Insurance Association with Pan National Life Insurance Company, with the Union Life Insurance Association as the surviving corporation. Petitioner became president of the successor corporation. Petitioner realized salaries and fees in the amount of $7,200 before he terminated his relationship with these companies in 1945, after making arrangements for reinsuring the business of the Union Life Insurance Association with American Life Insurance Co., petitioner's relationship to which is discussed hereinafter in our findings. In 1952 petitioner, together with several other individuals, organized the Birmingham Lead & Smelting Co., Inc. Petitioner made a capital contribution of approximately $5,000, purchased land for the corporation, and in general *108 served in a management capacity. Petitioner was the secretary of the corporation and kept the corporation's books in his office. In furthering the development and promotion of this corporation petitioner guaranteed loans made to the corporation in each of the years here in issue. Petitioner has continued his interest as a stockholder and officer of the corporation and is presently receiving a salary of $1,800 per year. From 1945 to 1959 petitioner made a number of loans of small amounts to various individuals. In 1955 petitioner made seven loans totaling $1,950; in 1956, seven loans totaling $5,489.50; in 1957, ten loans totaling $1,432. In addition to the 20 business enterprises heretofore described, petitioner participated to some extent in at least 58 other ventures of various types during the years 1933 through 1957. Some of these were merely projects that he considered and discussed with prospective associates. Others were investigated to a limited extent by petitioner and after small expenses had been incurred in investigation, abandoned as impracticable. The foregoing description includes about 34 proposed ventures. Petitioner participated in about 24 other enterprises *109 in many of which he neither realized a gain nor suffered a loss. In others he realized small gains or suffered losses, the amounts ranging from approximately $100 to approximately $400. These ventures included a night club, a second-hand machinery business, oil exploration, used cars and filling station, steel fabrication, a soft drink bottling business, boat building, coal mining, a home improvement business, an ice show, and a house building business. Petitioner during the years here involved and for several years prior thereto spent approximately one-half of his time on work in connection with the various ventures in which he participated or considered participating. Finding of Ultimate Fact During the taxable years 1955, 1956 and 1957, petitioner was engaged in the separate trade or business of promoting, organizing, financing, and managing business enterprises. During the year 1956 petitioner sustained a loss in the amount of $8,109.89 from his association with Harbin, and a loss of $1,686.01 in connection with Hypoterra Corporation, which are proximately related to this trade or business, and in the year 1957 incurred business bad debts in the amounts of $2,192.21 and *110 $10,529.60 as a result of business loans to Vogue School of Charm and Aggregate Limestone Company. 3. Interest Petitioner during the year 1955 paid interest in the amount of $3,948.96 on personal loans. Part of the money he borrowed was used for the purchase of 1,564 shares of American Life Insurance Company stock. The balance of the money received by petitioner on these personal loans was used in financing the various enterprises hereinbefore described. None of such money was used for personal living expenses of petitioners. The portion of the money borrowed for purchasing stock of American Life Insurance Company was only borrowed for a period of a little over 4 months. One-half of the interest paid by petitioner in 1955 is attributable to money borrowed to finance the purchase of American Life Insurance stock and the other one-half is attributable to money used to finance the various business enterprises in which petitioner was interested. Petitioners claimed a deduction as a business expense for interest paid on their 1955 income tax return in the amount of $4,266.26. Respondent in his notice of deficiency disallowed this claimed deduction, but allowed a deduction from adjusted *111 gross income for interest paid in the amount of $3,948.96 and disallowed the $1,000 standard deduction claimed by petitioner. 4. Automobile Expense During each of the taxable years 1955, 1956, and 1957, petitioner owned one or more automobiles used in his law practice and in his promotional business. Petitioner also used one of these cars for commuting purposes and made a round trip of approximately 9 miles from his home to his office each workday. Petitioner also owned an automobile which was used primarily by his wife although petitioner occasionally made a business trip in this car. Petitioner deducted as a business expense in each of the years here involved storage and parking charges, insurance and taxes and the entire cost of gas, oil, tires and repairs for all the cars owned by him except the car used primarily by his wife. The amounts of the deductions claimed for gas, oil, tires and repairs were $1,765.61, $1,014.30 and $983.20 in the years 1955, 1956 and 1957, respectively. Respondent disallowed $300 of the amount claimed for each of the years on the ground that such amount represented the expense of the operation of the automobile for personal use and did not constitute *112 an ordinary and necessary business expense. 5. Option Contract During the first part of 1955 certain differences had arisen among the stockholders, directors, and officers of the American Life Insurance Company. Petitioner owned 3,549 shares of the company's stock and he and others organized into a group or stock pool and employed Conville and Company, a Birmingham brokerage firm, to arrange a sale of all the stock of the group consisting of 15,000 shares. Conville's attorney, Ellis, was to hold the stock as agent or trustee. Ellis was put in contact with Basil P. Autrey and they entered into an option agreement about July 12, 1955. Under the terms of the agreement Autrey paid $20 per share and was to pay the balance of $45 per share by October 1, 1955, the date of the expiration of the option. Petitioner received $70,980 as partial payment for his 3,549 shares on July 16, 1955. Autrey failed to exercise his option to purchase the 15,000 shares and forfeited $300,000, which sum included the $70,980 received by petitioner. During the course of the dispute between the factions of stockholders petitioner sought to buy as much stock of the company as he could for his group. Three *113 or four men were employed for this purpose and 1,564 shares were purchased for petitioner at an average price of about $58. Before the option period expired it became apparent that it would not be exercised by Autrey. Petitioner made a trip to Chicago to try to sell the stock owned by his group, but the group was not in a position to offer the same proposition that could have been offered in July, since at that time the opposing faction had acquired sufficient stock to give it either absolute control or to make the acquisition of absolute control almost impossible by any purchaser of the group's 15,000 shares. Consequently, petitioner was unable to sell the stock. During the time the stock option was in force, petitioner and others lost whatever opportunity they may have had to sell their stock to other groups or other individuals for the same price or at a greater price than Autrey had agreed to pay. Petitioner and the other members of his group sold their American Life stock in the latter part of November 1955, through Conville and Company and its attorney to an interest or concern in Texas owned or dominated by a man named Post. In Schedule D of petitioners' income tax return *114 for the year 1955 they reported the sale of 3,681 shares of American Life stock for $284,240.50 and reported a long-term capital gain of $249,567.64. Included in the $284,240.50 shown as the selling price of the stock was the $70,980 received on July 16, 1955, as a result of the forfeiture by Basil P. Autrey of his option to purchase the stock. Respondent in his notice of deficiency determined the latter amount to constitute ordinary income and not long-term capital gain. 6. General Agent's Contract On June 15, 1953, petitioner owned 9,996 of the 10,000 shares of outstanding capital stock of Service Life and Health Insurance Company, hereinafter referred to as Service Life. Petitioner had prior to this date put approximately $19,000 into that company and treated the amount as a contribution to capital. On that date he entered into a contract with that company which provided, in part, as follows: 1. The General Agent [petitioner] agrees to act as the managing officer of Service Life beginning on the date hereof and agrees to use his best efforts and talents to make Service Life solvent and to employ such agents and solicitors as shall be reasonably possible with all convenient *115 speed to write insurance for Service Life and to inspect the business already on the books of Service Life to the end that the business of the Company may be put on a sound basis. The General Agent agrees to supervise and manage all the other business and activities of Service Life. 2. Service Life agrees to pay to said General Agent 10% of the gross receipts of Service Life each month hereafter for his services rendered pursuant to the within contract continuously for twenty (20) years beginning on the First day of January 1954, and ending on the 31st day of December 1973. 3. This contract may be cancelled by either party hereto effective on the last day of any month hereafter during said twenty year period. Should the General Agent cancel the within contract, or cease to do and perform his duties hereunder, or abandon the within contract, then in either of said events, the obligation of Service Life to the General Agent hereunder thereafter shall be a sum equal to 5% of the gross receipts of Service Life for the month immediately preceding any such cancellation or abandonment which sum shall be paid each month thereafter to December 31, 1973, except that in no event shall the *116 monthly payments to the General Agent after any such cancellation or abandonment exceed 5% of the gross receipts of Service Life for the month during which payment is made hereunder. Should Service Life cancel the within contract for any cause whatsoever Service Life shall thereafter pay to the General Agent 10% of the gross receipts of Service Life each month during the term of this contract, except that in no event shall the amount due the General Agent in any month be less than 10% of the gross receipts of Service Life for the month immediately preceding cancellation by Service Life. This contract shall inure to the benefit of the parties hereto and to their respective heirs, successors and assigns. The commissions provided for herein shall be a first lien on the gross receipts of Service Life. On November 1, 1954, Service Life and Health Insurance Company reinsured its business with the National Union Life Insurance Company. Simultaneously with that transaction, the latter company entered into a contract with petitioner, the principal provisions of which were as follows: WHEREAS, F. R. Ingram is the owner of that certain General Agent's contract executed by and between *117 Service Life and Health Insurance Company and F. R. Ingram under date of June 15, 1953, under and by virtue of which said Ingram is entitled to commissions on the gross premium receipts of said Service Life and Health Insurance Company, copy of which General Agent's Contract is attached hereto, and WHEREAS, National Union has this day purchased all the business of Service Life and Health Insurance Company and National Union now desires to purchase said General Agent's contract in order that the same may be by National Union cancelled and annulled, and WHEREAS, said Ingram is willing and desirous of assigning and transferring said General Agent's contract to National Union, NOW, THEREFORE, F. R. Ingram does hereby transfer, sell, assign and convey into National Union all his right, title, and interest in and to said General Agent's contract, upon the following terms and conditions: 1. National Union Life Insurance Company shall pay to F. R. Ingram on the first day of each month hereafter for so long as said F. R. Ingram shall live, but in any event for a period of eight years from the date hereof, one percentum (1%) of the gross monthly premium income realized by National Union *118 from all hospitalization, surgery and medical insurance policies, commonly referred to as "Hospitalization Business" in force in the State of Alabama, up to $100,000 per month gross premium income but not less than $200 per month, one-half of 1% on the next $100,000 of gross premium income in the State of Alabama, and one-fourth of 1% of the gross premium income in said state in excess of $200,000 per month, not to exceed $2,500.00 per month in accordance with the attached schedule. 2. Said commission shall be paid by National Union to said Ingram on the first day of each month hereafter beginning December 1, 1954. 3. Should said Ingram die prior to October 31, 1962 (eight years from the date hereof) the remaining payments due from the date of his death to October 31, 1962, shall be paid to Ingram's heirs, personal representatives, or assigns. 4. The commissions herein provided for shall be a lien upon the gross premium receipts of National Union realized from Hospital business in the State of Alabama each month hereafter during the term of this agreement. 5. This agreement shall be fully assignable but no assignment hereof shall be binding on National Union until thirty days *119 after written notice of assignment by registered mail has been received by National Union. 6. Payments of commissions hereunder, at all times hereafter during the lifetime of said Ingram, or until October 1, 1962, in any event shall be not less than $200 per month and shall not exceed $2,500 per month. 7. This agreement shall inure to the benefit of the parties hereto, and to their respective heirs, personal representatives, successors or assigns. In the taxable year 1955 petitioner received $3,500 from the National Life Insurance Company and reported it on his income tax return as a long-term capital gain from the sale of "Service Life Renewal Contract" giving the date acquired as June 15, 1953, and the date sold as 1955. Respondent determined that this transaction resulted in ordinary income to petitioner in 1955. 7. Rental Income Petitioner in 1954 owned 9,996 shares of the 10,000 shares outstanding of the stock of Service Life and in order to improve the financial statement of that company petitioner during 1954 conveyed his title to an apartment house known as the 55th Street Apartments to the company subject to an existing mortgage. The property was shown on Service *120 Life's balance sheet as an asset. Petitioner had advanced to Service Life by the end of 1955 the amount of $19,100 which he considered to be a capital contribution. The insurance of Service Life was later reinsured with another company and it was no longer necessary to keep the balance sheet solvent so petitioner had the property reconveyed from Service Life to himself on January 2, 1956. During 1955 rents in the amount of $1,176.45 were received in petitioner's law office, deposited to his personal checking account and commingled with his personal funds although he maintained some record that the rental income was held for Service Life. The amount was not shown as a liability to Service Life on petitioner's books or shown in any way on Service Life's books until it was discovered when the books were examined in 1957. The rental income was never remitted to Service Life and was not reported in any of petitioner's income tax returns or in the income tax returns of Service Life. Respondent in his notice of deficiency determined that the amount of $1,176.45 was rental income to petitioner in 1955. Opinion 1. Theft Loss Section 165(a) of the Internal Revenue Code *121 of 1954 provides that, "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Section 165(c)[1] limits this deduction in the case of an individual to losses incurred in a trade or business or in any transaction entered into for profit, though not connected with a trade or business, and losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. Under the provisions of this section if the loss from petitioner's guaranty of the Ogburn Co. notes is determined to be a loss from theft, it is deductible by petitioner in the taxable year in which he discovered the loss. [2] Petitioner has the burden of showing that he sustained a loss arising from theft which he discovered in the taxable year in which the deduction is sought. We have set forth in our findings the circumstances which occasioned petitioner's payment of the Ogburn Co. note to the First National Bank of Birmingham. *122 Petitioner, contending that these circumstances amount to a theft from him, points out that theft is not a technical word of art with a narrowly defined meaning but is intended to cover any criminal appropriation of another's property to the use of the taker and includes theft, swindling, false pretenses, or other guile. Edwards v. Bromberg, 232 F. 2d 107 (C.A. 5, 1956), and Curtis H. Muncie, 18 T.C. 849 (1952). Whether a theft loss has been sustained by a taxpayer depends upon the law of the jurisdiction in which the particular loss occurred. Michele Monteleone, 34 T.C. 688, 692 (1956), and cases there cited. Petitioner contends that the loss claimed herein should be considered to constitute a theft loss under sections 209 and 213, article I, chapter 45 of title 14 of the Code of Alabama, [3] dealing with false pretenses, cheats, etc. Petitioner cites a number of Alabama cases dealing with the obtaining of money by false pretenses. In the case of Young v. State, 45 So. 580, 591, the following is stated with respect to what constitutes the offense of obtaining property by false pretense: *123 If a person should fraudulently represent a fact to be true knowing at the time that it is not true, resorting to the fraudulent representation to obtain money from another, and does so to obtain it, he would be guilty of defrauding another by deceit, and we do not doubt would be guilty of obtaining money under false pretense. Under Alabama law, when it has been shown that a person obtained money or property by false pretense, it is immaterial that he may later deliver it to another. *124 Carroll v. State, 94 So. 194 (Ala. App., 1922). It is a necessary element to conviction under section 209, title 14, Alabama Code that it be shown that the accused did obtain money or property by false pretense. In Pollock v. State, 97 So. 237, 238 (Ala. App., 1923), the court stated: So the result is that this record discloses that the defendant was convicted of the offense charged in the first and third counts in the indictment, without any evidence whatever to support the material allegation that he obtained from J. B. Martin the sum of $500 by means of false pretense. If it should be conceded that the defendant did by false pretense obtain the signature of Martin to a written instrument or note, and the note was subsequently paid by Martin, as to which fact there is some evidence that the note was subsequently paid by Martin to the corporation, such proof would not support a conviction for obtaining money by false pretense. We will assume, as petitioner contends, that a person who had obtained property or money by false pretense within the provisions of section 209, title 14, Alabama Code, would for tax purposes, have committed a theft, and the person *125 who was induced to turn over his property or money to such person in reliance on the false pretense would have sustained a theft loss. Cf. J. H. McKinley, 34 T.C. 59 (1960). However, the facts in the instant case do not show that W. E. Ogburn obtained any money or other property from petitioner by false pretenses. Even if we assume that petitioner was induced to endorse the notes of Ogburn Company in reliance on false accounts receivable prepared by W. E. Ogburn, no money or property has been shown to have been received by Ogburn from petitioner when petitioner endorsed the notes. Apparently Ogburn Co. did receive money from the First National Bank upon giving their notes which were endorsed by petitioner but under the decisions of the Alabama courts, the requisites of section 209, title 14, Alabama Code, are not thereby met. Pollock v. State, supra.
Petitioner has also failed to show sufficient facts to establish that the actions of W. E. Ogburn in overstating accounts receivable of Ogburn Co. would constitute a violation of section 213, title 14, Alabama Code. The record is totally devoid of evidence that Ogburn obtained petitioner's endorsement on *126 the notes with intent to injure or defraud petitioner. Furthermore, nothing to which our attention has been directed indicates that a violation of section 213, title 14, Alabama Code, would be tantamount to theft within the meaning of section 165(e) of the Internal Revenue Code of 1954. Cf. Samuel Towers, 24 T.C. 199, 242 (1955), affirmed sub. nom, Bonney v. Commissioner, 247 F. 2d 237 (C.A. 2, 1957), certiorari denied 355 U.S. 914. We hold that petitioner has not shown that he sustained a theft loss in the year 1955 in connection with his endorsement of the notes of Ogburn Co.
Even had petitioner shown that the loss that he sustained in connection with his guaranty of the Ogburn loans was a theft loss, he had failed to show that he sustained any loss in the year 1955. Petitioner points to the provision of the Code that a theft loss will be considered to be sustained in the year that it is discovered. However, a guarantor on a note, no matter what induced him to sign that note, has not sustained a loss thereby until he pays the note because of the inability of the prime obligor to pay. *127 Helvering v. Price, 309 U.S. 409 (1940). The evidence shows that when petitioner became aware that certain of the accounts receivable of the Ogburn Co. were not in amounts as great as W. E. Ogburn had reported to him, he began to take over the operation of the company, collected accounts receivable, and completed the performance of contracts which the company then had. In connection with this operation he renewed certain of the Ogburn Co. notes and continued to pledge accounts receivable for his own protection. In fact petitioner did realize profits from operations of Ogburn Co. during the year 1956 in an amount in excess of $19,000 (stated by petitioner in his brief to be $20,590.36) which he reported as income in the year 1956. Also, a portion of the Ogburn notes was paid off by the company during this period of time. In this state of the record it is clear that petitioner has failed to show that in the year 1955 the transaction had been so concluded that as of that time he had any loss. While section 165(e) requires a theft loss to be considered as sustained in the year of its discovery, there is nothing in the section to indicate that discovery of some false representation *128 will create a theft loss where as of the date of such discovery no loss of any kind has finally been sustained. Cf. Burnett v. Huff, 288 U.S. 156 (1933), and Leedy-Glover Realty & Insurance Co., 13 T.C. 95, affd. 184 F. 2d 833 (C.A. 5, 1950), on other issues. Petitioner, on his income tax return and in his original petition, claimed the loss in connection with the guaranty of the notes of Ogburn Co. as a business loss in 1955. Respondent contends that petitioner, in his Amendment to Original Petition as Last Amended, filed December 5, 1960, abandoned his contention that the loss on his guaranty of the notes of Ogburn Co. was a business loss by his allegation that this deduction should be allowed for the reason that the Ogburn loss was a theft loss under the law, which the petitioner, F. R. Ingram, discovered in 1955. In his earlier pleadings petitioner had claimed the loss as a business loss in 1955. We do not agree with respondent's position that petitioner is limited to the claim made in his amendment to petition that the amount is a theft loss. Under issue 2 we will consider whether this loss has been shown to be a loss sustained in petitioner's *129 trade or business. 2. Claimed Trade or Business Losses and Bad Debts Petitioner contends that he was engaged in the separate and distinct trade or business of promoting, organizing, financing, managing, and dealing in business enterprises in each of the years here involved and that the amounts claimed by him to be deducted as business losses and business bad debts in each of these years were losses sustained or debts incurred in this trade or business. The question whether the activities of a taxpayer constitute carrying on a trade or business is largely one of fact. Commissioner v. Stokes' Estate, 200 F. 2d 637 (C.A. 3, 1953), affirming a Memorandum Opinion of this Court. While the activities of an individual in investing or reinvesting his assets in corporate securities, no matter how extensive and time consuming, do not constitute a separate trade or business, Higgins v. Commissioner, 312 U.S. 212, in the exceptional situation where an individual's activities in promoting, managing, and financing business enterprises have been sufficiently extensive, varied and continuous, such activities have been held to constitute a separate trade or business. *130 Vincent C. Campbell, 11 T.C. 510 (1948); Henry E. Sage, 15 T.C. 299 (1950); Cf. Charles G. Berwind, 20 T.C. 808, 815, affd. per curiam 211 F. 2d 575, (C.A. 3, 1954). Upon consideration of all the evidence in this case, we think the petitioner has shown that his activities in promoting, financing, managing, and making loans to various enterprises were sufficiently varied and extensive as to constitute a separate business in the years here involved and have so found as an ultimate fact. We have set out at some length in our findings a description of various ventures in which petitioner participated from 1941 onward. Petitioner has shown that his activities in connection with these ventures were those of an active participant involving the contribution of his time, money, effort, and management skills. The facts show that petitioner derived substantial income from his promotions and that he has spent approximately one-half of his working time on the promotions since he began the practice of law. Respondent points out that in instances where petitioner sold a business at a gain he reported the amount as a capital gain and contends *131 that if petitioner were in the trade or business of promoting, organizing managing, financing, and dealing in business enterprises, those enterprises were his stock in trade or property held primarily for sale to customers in the ordinary course of his trade or business, the gain from the sale of which should have been treated as ordinary income. Cf. H. Beale Rollins, 32 T.C. 604, 616, affd. 276 F. 2d 368 (C.A. 4, 1960). The evidence shows that where petitioner incorporated a business and sold the stock, he did report the gain or loss as a capital gain or loss. In other instances, petitioner reported the gain from disposing of a business interest prior to incorporating it as ordinary income. If we assume as respondent contends that in each instance where petitioner incorporated an enterprise, the gain or loss from the sale of the stock should have been reported as ordinary gain or loss, this would show only how petitioner viewed the transaction at the time it occurred. While this is evidence to be considered, it is not conclusive. The evidence as a whole shows that petitioner was engaged in the trade or business of promoting, organizing, managing, financing *132 and dealing in business enterprises. In order for a loss to be deductible as a loss in a taxpayer's trade or business or a bad debt to be deductible as a business bad debt, such loss or bad debt must be incurred in a taxpayer's trade or business or proximately related to the taxpayer's trade or business when created or acquired. Jan G. J. Boissevain, 17 T.C. 325 (1951) and Aubrey S. Nash, 31 T.C. 569 (1958). This requires a consideration of each of the business losses or business bad debts claimed by petitioner to be deductible as such in the years here involved in order to determine whether it was incurred in the taxpayer's trade or business or whether the proximate relationship at the time it was created or acquired has in each instance been established. Ogburn Loss In his 1955 return and in his original petition to this Court petitioner claimed that this loss was deductitble as a business loss. We have held that this loss was not a theft loss as alleged by petitioner in his Amendment to Original Petition as Last Amended. It is clearly settled that section 165 of the Internal Revenue Code of 1954 allowing a deduction for *133 "losses sustained during the taxable year and not compensated for by insurance or otherwise", and section 166, allowing a deduction for bad debts which become worthless within the taxable year, are mutually exclusive. Spring City Co. v. Commissioner, 292 U.S. 182 (1934). In Putnam v. Commissioner, 352 U.S. 82 (1956), the Supreme Court held that a loss suffered by a guarantor upon payment of the obligation of a principal debtor is a bad debt loss. In the instant case, if the loss is deductible at all, it is deductible only under section 166[4] as a business bad debt or as a nonbusiness bad debt to the extent allowed by that section.
*134 Section 166(a)(1) provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. Section 166(d)(1) provides that in the case of a taxpayer other than a corporation subsection (a) shall not apply to any nonbusiness debt and that the loss on a nonbusiness debt shall be treated as a short-term capital loss. Section 166(d)(2) defines a nonbusiness debt as a debt other than - (A) a debt created * * * in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. To be entitled to deduct his loss on the Ogburn Co. notes as a business bad debt, petitioner must show that his guaranty of the debts of the Ogburn Co. was a debt the loss from the worthlessness of which was incurred in his trade or business or was proximately related to his trade or business of promoting, organizing, managing, and financing business enterprises at the time the debt was created. An individual who is engaged in the business of promoting business enterprises may also have investments in property just as an individual in any other trade or business. Petitioner had *135 joined in the forming of the Ogburn Co. in 1947, more than 8 years prior to the time he endorsed the notes of Ogburn Co. in 1955 which caused him to suffer a bad debt loss. Prior to 1947 he had financed the Ogburns in various business activities. Certainly before 1955 the Ogburn Co. had passed through its promotional phase. Although the evidence does not show the precise time when Ogburn Co. ceased to be a promotion and became an investment, the record is clear that it was before 1955. Cf. Ferguson v. Commissioner, 253 F. 2d 403 (C.A. 4, 1958), affirming 28 T.C. 432 (1957). In 1955 petitioner had been receiving a salary of $150 per week as an officer of this corporation for some time. There is no evidence that petitioner ever attempted to dispose of his stock in Ogburn Co. although the company had operated profitably up to 1955. Cf. H. Beale Rollins, supra.The management of the corporation had been left primarily with W. E. Ogburn, petitioner having turned his attention to the promotion of other enterprises. By 1955 petitioner's interest in Ogburn Co. had become that of an investor. *136 Therefore, a loss from the worthlessness of a debt of Ogburn Co. in that year or thereafter was not incurred in petitioner's trade or business. The guaranty of the notes of Ogburn Co. in 1955 which gave rise to the debt was not proximately related to petitioner's trade or business of promoting, organizing, financing, and managing business enterprises. Cf. Benjamin D. Gilbert v. Commissioner, 262 F. 2d 512 (C.A. 2, 1959), affirming a Supplemental Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002; Wilfred J. Funk, 35 T.C. 42 (1960). When in June 1956 petitioner had wound up the affairs of Ogburn Co. and as guarantor paid the outstanding amount of its note, he had a loss from a bad debt in the amount of such payment less the $19,000 or $20,000 profits from winding up the business of Ogburn Co. which he could have used to pay a portion of the debt but did report as income in 1956. Under section 166(d) of the Internal Revenue Code of 1954 this bad debt loss is considered as a loss from the sale or exchange of a capital asset held for not more than 6 months. Petitioner is not entitled to any deduction for a loss *137 on the Ogburn Co. notes in the year 1955. a. Harbin Loss Petitioners on their 1956 income tax return claimed a loss of $12,000 from the enterprise known as Harbin Pipeline Company. Respondent allowed $8,109.89 of this amount as a capital loss. The evidence is clear that the amount of petitioner's loss in 1956 was $8,109.89, petitioner having been reimbursed $3,890.11 of the $12,000 advanced by him by the assignment to him of the amount owed to Harbin by Aggregate Limestone Company. Petitioner contends that this $8,109.89 loss was either a business bad debt or business loss. The evidence is not completely clear as to the nature of the understanding between petitioner and Harbin, either when the original $7,000 was advanced in the pipeline venture or the additional $5,000 in the trucking venture. It seems reasonably clear that Harbin did not consider the amount a debt when the venture failed, as he did an additional advance of $1,500 which he repaid. Although petitioner referred to the $12,000 as a loan, he made no efforts to collect the amount from Harbin when Harbin's financial situation became such that he could have repaid the amounts. The evidence as a whole indicates that *138 petitioner placed the $12,000 in these ventures as a part of his business of promoting and financing business enterprises. Cf. Phil L. Hudson, 31 T.C. 574 (1958). The advances having been made by petitioner in the ordinary course of his trade or business, the $8,109.89 loss in 1956 is a loss incurred in petitioner's trade or business deductible under section 165(a) of the Internal Revenue Code of 1954 in the year 1956. b. Hypoterra Corporation Loss Petitioners claimed a deduction in the amount of $2,100 in their income tax return for 1956 as a "Loss on Taxpayer's enterprise known as the Hypoterra Corporation (which never incorporated) * * *". Respondent contends that the loss sustained was $1,700, that the year of the loss was 1957 since the company owned a marketable device and had some operating capital in that year and that the loss was a capital loss. The evidence indicates that petitioner and his associates had abandoned hopes of marketing the garden watering tool in November of 1956 on learning of a similar device offered for sale by Montgomery Ward. The debts of the company were fully paid off in that month and petitioner and his associates *139 ceased efforts at promoting the tool. All activity with respect to the promotion of the corporation terminated in 1956 and petitioner's interest therein became worthless in that year. Cf. Boehm v. Commissioner, 326 U.S. 287 (1945). At December 31, 1956, Hypoterra Company had cash on deposit in the bank after payment of all its debts in the amount of $413.99. This amount was available to petitioner. Petitioner's loss in 1956 was thus $1,686.01, the $2,100 advanced to the company less the $413.99 available for withdrawal by him. As our findings indicate, the advances to Hypoterra Corporation by petitioner were in connection with his business of promoting, managing, and financing business enterprises. The loss was incurred in petitioner's trade or business and is deductible under section 165(a) of the Internal Revenue Code of 1954 in the year 1956. c. Vogue School of Charm Petitioners claimed a deduction of $2,192.21 on their 1956 income tax return as a loss from a worthless debt of the Vogue School of Charm. Respondent contends that the debt did not become worthless in 1956 but in 1957 and that it is a nonbusiness bad debt. The Vogue School *140 of Charm was in operation as a going business into 1957, occupying space in the Mars Building. Petitioner recovered $1,000 in settlement of his total claim of $3,192.21 in 1957. While petitioner made his last advance to this enterprise in 1956 because he had become doubtful of its success, petitioner has not shown any event which indicated that the debt was uncollectible in 1956. Cf. W. A. Dallmeyer, 14 T.C. 1282, 1291-4 (1950). The debt became worthless in 1957 when the business ceased operating and petitioner agreed to take and did in fact receive $1,000 in settlement thereof. Petitioner's advances to Annie L. Whitten were in connection with his business of promoting and financing business enterprises and the bad debt in the amount of $2,192.21 is deductible as a business bad debt in 1957. d. Aggregate Limestone Co. Loans The parties have agreed that petitioner sustained a bad debt loss in 1957 of $10,529.60 when debts owed him by Aggregate Limestone Co. became worthless to that extent as a result of the value of the property received by him on his foreclosure of chattel mortgages being to that extent less than the company's indebtedness to him. Respondent contends *141 that this debt was a nonbusiness bad debt. The evidence shows that petitioner's loans to Aggregate Limestone were made in connection with his business of promoting, organizing, and financing business enterprises and were business loans. Petitioner is entitled to a deduction in the amount of $10,529.60 in 1957 as a loss from a business bad debt. 3. Interest Petitioner contends that he is entitled to deduct as a business expense the interest paid by him in 1955 in the amount of $3,948.96. The parties agree that petitioner paid interest in the amount of $3,948.96 in the year 1955 but respondent contends that this amount is deductible only from adjusted gross income as an itemized personal deduction in lieu of the standard deduction claimed by petitioner. The purpose for which the money borrowed is used determines whether the interest paid thereon is deductible as a business or nonbusiness expense. United States v. Wharton, 207 F. 2d 256 (C.A. 5, 1953). The evidence is clear that petitioner in 1955 borrowed money both to purchase stock of American Life Insurance Company and to invest in various other enterprises. Both parties agree that petitioner's American Life *142 Insurance Company stock was a capital asset, held by him as an investment. It follows that to the extent that the interest was on borrowed funds used to purchase American Life Insurance Company stock, it would be deductible only from adjusted gross income. Since petitioner was engaged in the trade or business of promoting, managing, and financing business enterprises in the year 1955, interest on the money borrowed for such use would be deductible as a business expense. While the record does not show precisely the amount of the money borrowed by petitioner in 1955 which was used for each purpose, it does show that his borrowings for purchase of American Life Insurance Company stock were confined to a period of approximately 4 months, that the total number of shares purchased by petitioner at that time was 1,564 and the average purchase price was approximately $55. Considering the evidence as a whole and weighing heavily against petitioner for lack of precise proof, we hold that one-half of the interest paid by him in 1955 is deductible as a business expense and the balance is deductible from adjusted gross income only. 4. Automobile Expense Petitioners on their income tax returns *143 claimed deductions for automobile expenses of oil, gas, tires and repairs in the amounts of $1,765.61, $1,014.30 and $983.20 for the years 1955, 1956 and 1957, respectively. Respondent disallowed $300 of the amount claimed for each of these years. In each of the years petitioner separately claimed deductions for storage and parking charges and insurance and taxes. Petitioner contends that the only personal use he made of the automobiles for which these expenses were claimed was in driving the round trip from his home to his office each workday. Petitioner estimated the cost of this personal use of his business automobiles at $78 a year and argues that this amount is offset by the occasional business use he made of the automobile normally driven by his wife, none of the expenses of which were claimed as deductible expenses, and the fact that he claimed no deduction for depreciation on any of the cars. Petitioner's estimate of the cost of his daily commuting from his home to his office, a trip of approximately 9 miles, appears low even if petitioner drove the most direct route on each trip, which is not shown to be a fact. The record does not show the extent of petitioner's use of the *144 car normally driven by his wife for business purposes. The charges listed by petitioner as automobile expense include tires and items designated as repairs, the nature of which are not shown which might well be items that would constitute capital expenditures had he claimed depreciation on the automobiles. The age and cost of the automobiles are not shown in the record. The burden of proving error in the disallowance of the deduction to the extent of $300 in each year is on petitioner. Petitioner made some personal use of the automobiles normally used for business purposes. Since no separate records were kept of the expenditures on the automobiles for personal use, the amount can only be estimated. The evidence fails to show that the $300 amount determined by respondent to be attributable to petitioner's personal use of his automobile is erroneous. Because of petitioner's failure of proof, we sustain respondent's disallowance of $300 of the deduction claimed by petitioner as automobile expense in each of the years here involved. 5. Option Contract On July 12, 1955, petitioner, together with other stockholders of American Life Insurance Company who had formed a group or stock *145 pool, granted an option through their broker to Basil P. Autrey to purchase their stock in the company. Autrey made a payment of $20 per share and under the terms of the contract was to pay the balance of $45 per share by October 1, 1955. Petitioner received $70,980 as partial payment for his 3,549 shares on July 16, 1955, at the rate of $20 per share. Autrey failed to exercise his option and forfeited $300,000 including the $70,980 paid petitioner. In the latter part of November 1955 petitioner and the other members of the stock pool sold their American Life Insurance Company stock through the same broker who had handled the option to an interest or concern dominated by a man named Post in Texas. There was no relationship between the final purchaser, the concern dominated by Post, and Basil P. Autrey who forfeited the money on nonexercise of the option. On his 1955 return, petitioner added the $70,980 received from Autrey to the proceeds received on the sale of his American Life Insurance Company stock to Post's interest, to arrive at the sales price of his stock for the purpose of determining the gain thereon which he reported as long-term capital gain. Respondent determined *146 that the $70,980 which petitioner retained when Auttrey failed to exercise his option was ordinary income. Petitioner argues that since the same broker negotiated the option and the sale of the stock and the same persons formed the stock pool in each instance, the two transactions should be treated as one. The facts do not support petitioner's contention. The transaction with Autrey was a closed transaction when Autrey let his option to purchase the stock expire without exercising it. The expiration of the option unexercised fixed the nature of the payment for the option as ordinary income. Cf. Dill Co., 33 T.C. 196 (1959) affd. 294 F. 2d 291 (C.A. 3, 1961). The option expired in October 1955. The sale of the stock later in the year 1955 was a separate transaction. Respondent does not contend that petitioner's gain on the sale of this stock is other than long-term capital gain. The respondent's determination on this issue is sustained. 6. Income from Service Life Renewal Contract On June 15, 1953, petitioner and his wholly owned Service Life and Health Insurance Company (hereinafter referred to as Service Life) entered into a contract entitled "General *147 Agent's Contract" which provided that petitioner as general agent would act as managing officer of Service Life, would use his best efforts to make the company solvent, and would employ agents to write insurance for the company. In return Service Life promised to pay petitioner 10 percent of the gross receipts of the company each month for a period of 20 years. The contract provided that if petitioner cancelled the contract or ceased to perform his duties, then the obligation of Service Life would be reduced to a sum equal to 5 percent of the gross receipts of Service Life for the month immediately preceding the month of cancellation or abandonment of duties, which sum was to be paid each month for the remainder of the term of the contract. On November 1, 1954, National Union Life Insurance Company, another of petitioner's promotions, reinsured or purchased the business of Service Life. Simultaneously, National Union Life entered into a contract with petitioner which provided that petitioner transferred, sold, assigned, and conveyed all his right, title, and interest in the contract of June 15, 1953, with Service Life. In consideration of the cancellation and termination of petitioner's *148 right in the Service Life contract, National Union promised to pay petitioner a percentage of the gross monthly premiums written on hospitalization insurance according to a sliding scale for petitioner's lifetime, or in case of his death, for at least 8 years. A minimum payment was established in the amount of $200 per month. Both contracts provided that they would inure to the benefit of the respective parties, their heirs, successors, or assigns. Petitioner contends that he is entitled to treat $3,500 received in 1955 from National Union as gain from the sale or exchange of a capital asset under the authority of Jones v. Corbyn, 186 F. 2d 450 (C.A. 10, 1950), Commissioner v. Covington, 120 F. 2d 768 (C.A. 5, 1941), and similar cases. Respondent contends that petitioner, in entering the contractual arrangement with National Union, merely abandoned his obligation to furnish personal service and relinquished the right to receive commissions or compensation for services of a personal nature and thus realized ordinary income under the contract. The facts of record here show that the percentage of gross receipts to be received by petitioner under the provisions *149 of the General Agent's contract with Service Life constituted compensation for services rendered or to be rendered in promoting, financing, and managing Service Life. Petitioner, himself, has stressed the fact that he was obligated to use his best efforts to make the company solvent. Not only is the doctrine of the cases relied on by petitioner of doubtful validity since the decision of Corn Products Refining Co. v. Commissioner, 350 U.S. 46, Cf. Mansfield Journal Co., 31 T.C. 902, 910 (1959) affd. 274 F. 2d 284 (C.A. 6, 1960), but the facts in the instant case are different. Here petitioner was in the business of promoting, managing and financing business enterprises and his contracts with Service Life and with National Union were entered into in connection with this business. Under the Service Life contract petitioner was required to render services and the amount received or to be receivable under the National Union contract was in substance payment for the cancellation of the Service Life contract. Under such circumstances the character of the income received under the second contract remains the same as under the cancelled contract. *150 The amount received in 1955 was in effect a substitute for the compensation that would have been received under the Service Life contract and as such constituted ordinary income to petitioner. Nat Holt, 35 T.C. 588 (1961), on appeal (C.A. 9, July 17, 1961); F. W. Jessop, 16 T.C. 491 (1951). Cf. Commissioner v. P. G. Lake, 356 U.S. 260 (1958). 7. Rental Income In 1953 petitioner purchased all of the capital stock (with the exception of certain qualifying shares) of Service Life and Health Insurance Company for $1,000. The company was then in an insolvent condition and in order to have the balance sheet of Service Life show that the company was solvent petitioner conveyed an apartment house which he owned to Service Life subject to an existing mortgage. This property was shown as an asset of Service Life until petitioner sold the business of that company in 1956. Petitioner then reconveyed the property to himself. There is no evidence of any consideration passing between the parties on the occasion of the original transfer to Service Life or on the conveyance to petitioner in 1956. While Service Life did receive legal title to this property, *151 the transaction was not an arms-length one. There is no evidence in the record to show why petitioner was justified in having the property reconveyed to him without consideration after the business of Service Life was reinsured with National Union and it was no longer necessary that Service Life's balance sheet show it to be solvent. Even though as between Service Life and an unrelated party, this rental property might in 1955 have belonged to Service Life and have been subject to claims against that company, petitioner retained sufficient control to have it transferred back to himself when the need of greater assets by Service Life ceased. The record is lacking in evidence of the agreement, if any, between petitioner and Service Life when the apartment building was transferred to Service Life. The rents from the property were received in petitioner's law office, deposited to his personal checking account, and commingled with his personal and business funds. The rental income was never remitted to Service Life or set aside in a special account for it and was not reported in Service Life's income tax returns. So far as the record shows, all that was transferred to Service Life was the *152 legal title to the property, the equitable ownership remaining with petitioner. Insofar as this record shows petitioner in 1955 had the complete unrestricted use of the rental income. Under these circumstances, we hold that petitioner has failed to discharge his burden of proving that respondent erred in including the amounts received from rents in his income for the year 1955. Petitioners claimed the standard deduction in each of their returns for 1955, 1956 and 1957. Respondent, after determining that various items were not allowable as business expense deductions but were allowable as nonbusiness deductions from adjusted gross income in an amount greater than $1,000 in each of the years, computed taxable income on the basis of itemized deductions. There is no disagreement between the parties in regard to petitioner's right to use the standard deduction except those dependent upon the determination of the other issues herein. To the extent the determination of the other issues results in deductions from adjusted gross income for petitioners in excess of $1,000, such deductions should be reflected in the Rule 50 computations. Decision will be entered under Rule 50. Footnotes
1. Sec. 165(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed if, at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return. ↩
2. Sec. 165(e) I.R.C. 1954↩.
3. Sec. 209, Art. I, Ch. 45, Tit. 14, Ala. Code. * * * Obtaining property by false pretenses. - Any person, who by false pretense or token, and with the intent to injure or defraud, obtains from another any money or other personal property, shall, on conviction, be punished, as if he had stolen it. Sec. 213, Art. I, Ch. 45, Tit. 14, Ala. Code. Obtaining a signature by false pretenses. - Any person who, by any false pretense or token, and with the intent to injure or defraud, obtains from another his signature to any written instrument, the false making of which is forgery, shall, on conviction, be punished as if he had forged the instrument.↩
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. - When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩