107 So.2d 156 (1958)
William H. MELVIN, Appellant,
v.
William H. WEST, Appellee.
No. 70.
District Court of Appeal of Florida. Second District.
October 29, 1958.
Rehearing Denied December 9, 1958.
*157 Wm. A. McRae, Jr., Stephen H. Grimes, Holland, Bevis, McRae & Smith, Bartow, T.C. Houk and R.J. Randolph, Stuart, for appellant.
*158 English, McCaughan & O'Bryan, Fort Lauderdale, Paty, Downey & Daves, West Palm Beach, for appellee.
SEBRING, HAROLD L., Associate Judge.
West, a real estate broker, sued Melvin, a property owner, to recover a real estate commission allegedly earned by West for effecting the sale of certain of Melvin's lands to one Buchanan and his associates. By stipulation, the case was tried before the Circuit Judge without a jury and judgment was for the plaintiff. The defendant has appealed from the judgment assigning as grounds for reversal, that the evidence does not support the judgment and that the evidence shows that a non-licensed employee of the plaintiff actively participated in procuring the listing of the land and in procuring the purchaser and hence the plaintiff is barred by law from recovering a commission.
According to the evidence most favorable to the plaintiff, the defendant owned a piece of land which plaintiff understood contained approximately 3,000 acres and was for sale at $1,100 an acre. The defendant orally listed this property for sale with the plaintiff, and several other brokers, with the specific understanding that "the first registered real estate broker who brought in a check and a signed sales contract would be the successful negotiator of the deal."
About a month after West had been given the listing, he informed Melvin that he had a prospect who was interested in buying the 3,000-acre tract at $1,100 an acre. In reply, Melvin told West that the price was not $1,100 an acre for 3,000 acres, as understood by West, but was $3,500,000 whatever the acreage. West conveyed this information to his prospect, Buchanan, and thereafter and with full knowledge of the fact that the price of the property had been fixed at $3,500,000, West and Buchanan inspected the property. Shortly after viewing the property, West and Buchanan conferred with Melvin about the purchase of the property by Buchanan and two associates, but came to no definite agreement in regard to a sale. A few days after this conference, Buchanan informed West that he had ascertained that the tract did not contain 3,000 acres, as had been originally represented by West to him, but a lesser acreage, and hence that he and his associates were not interested in buying the property at the quoted price of $3,500,000 but might be willing to pay $2,750,000, and that if the counter offer was not acceptable they "would have no further interest in the matter."
After receiving this counter offer from Buchanan, West phoned Melvin and told him that if he was interested "in helping save the deal" he and West should "get (their) heads together and see if (they) could work out some way to work the situation out * * * (that) Mr. Buchanan was still interested in the property as such * * * and if the price and terms could be worked out to (Buchanan's) satisfaction * * * (he, West) felt the deal could still be made."
The evidence shows that a few hours after this conversation, West, Melvin, and L.V. Hart, one of West's employees, met in West's office at Ft. Lauderdale to discuss what might be done to "save the deal." The meeting ended when Melvin decided, with West's approval, that since he and Buchanan "were the two principals in the situation" he, Melvin, would negotiate directly with Buchanan, if some one would drive him to Miami Beach for the purpose. Thereupon Hart, West's employee, agreed to drive Melvin to Miami Beach where Buchanan was found and a conference was held, which began at approximately 5 o'clock in the afternoon and ended about three hours later, when Melvin finally agreed, after much discussion, to reduce the price of the property from $3,500,000 to $2,900,000, provided $600,000 was paid in cash and the remainder was paid in specifically-agreed annual installments, *159 with interest, over a 10-year period; and also agreed that since Buchanan had no authority to commit his associates to the purchase of the property at the new price and terms agreed on at the conference he, Buchanan, might have "until two o'clock the next day (Friday, March 16, 1956) to obtain the permission of (his) associates to continue with the business on the basis of this present agreement and to authorize the contract to be drawn up on this basis"; that in the event permission was obtained "to continue with the business," Buchanan would inform West and would "deposit" with him a check in the sum of $50,000 as a "binder payment"; and that Mr. and Mrs. Melvin would meet with West and Buchanan, at Buchanan's office, on Saturday morning, March 17, 1956, to execute a contract of purchase, to be prepared by West's attorney, which would bind the parties to the sale and purchase of the property.
The evidence is to the effect that on Friday morning, March 16, Buchanan got in touch with his two associates and obtained their permission to purchase the property at the price and terms agreed to by Melvin at the Thursday afternoon conference; that Buchanan called West, at about 11:30 Friday morning, to advise him that he had had "the matter confirmed and * * * had a check available"; and that West immediately phoned the Melvin residence to inform Melvin of what Buchanan had said, but was told by the person answering the phone that Melvin was away from the premises.
West continued calling the Melvin residence at frequent intervals throughout the remainder of the day but was never able to contact Melvin. That night, at a few minutes past midnight, Melvin called West to inform him that on that day he had sold the property to two prospects produced by a real estate salesman, one Harris, who also had an open listing on the property; that a down-payment check had been offered and accepted, and that a sales contract had been executed by seller and buyers and hence that he could not sell the property to Buchanan.
The testimony of plaintiff's witness, Harris, the real estate salesman who produced the purchasers to whom the property was sold, was to the effect that on Thursday, March 15, 1956, he had interested two prospects in buying the property at the price of $3,500,000 that was being asked by Melvin; that around 6 o'clock Thursday evening his prospects had offered him a "binder" check which he had refused because "they had not stepped on the property"; that he thereupon attempted to call Melvin but could not reach him, because he was not at home; that he called Melvin between 8:45 and 9 o'clock on Friday morning to inform him that he had the property sold and to request Melvin to meet with the purchasers so that the transaction might be closed without delay; that he met with Melvin one hour and ten minutes later and introduced him to the purchasers; that Melvin then went with Harris and the purchasers to the property, where a purchase contract was executed and a check was delivered between 2:45 and 3 o'clock in the afternoon.
The evidence shows, that after receiving this information late Friday night, West went to Miami Beach early Saturday morning to inform Buchanan that Melvin had sold the property to another prospect. While there West presented a contract of purchase for Buchanan's signature, had Buchanan execute it, and received from Buchanan his personal check in the sum of $50,000 which was dated March 16, 1956 and was made payable to the order of "Wm. H. West, Realtor." According to West, he accepted the check because "Buchanan felt that there might still be a possibility that Mr. Melvin would change his mind and that the other transaction would not go through * * * (and) he, wanted to be on record that he had carried out the part of the deal that he had made with Mr. Melvin."
*160 About thirty days later, after it appeared certain that Melvin had no intention of honoring his oral promise to Buchanan, West returned the check to Buchanan and instituted the present suit to recover a commission for selling the property.
The first question on the appeal is whether the foregoing evidence, when viewed in the light most favorable to the plaintiff, is sufficient to support the judgment rendered in his favor.
Two types of brokerage contracts are generally used in the business of selling real estate. Under the first type, the seller employs a real estate broker to procure a purchaser for the property, and the broker becomes entitled to his commission, when he produces a purchaser who is ready, able and willing to purchase the property upon the terms and conditions fixed by the seller, leaving to the seller the actual closing of the sale. Under the second type, the seller employs a broker to effect a sale of the property, and the broker, to become entitled to his commission, must not only produce a purchaser who is ready, able and willing to purchase the property upon the terms and conditions fixed by the seller but must actually effect the sale, or procure from the purchaser a binding contract of purchase upon the terms and conditions fixed by the seller. Knowles v. Henderson, 156 Fla. 31, 22 So.2d 384, 169 A.L.R. 600; Malever v. Livingston, 95 Fla. 272, 116 So. 15; Wiggins v. Wilson, 55 Fla. 346, 45 So. 1011.
Where a broker employed to effect a sale procures a purchaser who is ready, able and willing to purchase the involved property upon the terms and conditions fixed by the seller and before he can effect the sale or procure a binding contract of purchase the seller defeats the transaction, not because of any fault of the broker or purchaser but solely because he will not or cannot convey title, the broker will be entitled to his commission even though the sale has not been fully completed, if the buyer remains ready, able and willing to purchase the property upon the terms and conditions fixed; the strict terms of the contract between the seller and the broker requiring him to actually complete the sale or procure a binding contract of purchase being deemed, in such case, to have been waived by the seller. Knowles v. Henderson, supra.
As pointed out in Hanover Realty Corp. v. Codomo, Fla., 95 So.2d 420, the rule excusing the broker from complete performance where performance has been made impossible arbitrary acts of the seller is simply an application to brokerage contracts of the rules relating to contracts generally to the effect that "where a party contracts for another to do a certain thing, he thereby impliedly promises that he will himself do nothing to hinder or obstruct that other in doing the agreed thing" and "one who prevents or makes impossible the performance as happening of a condition precedent upon which his liability by the terms of a contract is made to depend cannot avail himself of its nonperformance."
It is vigorously contended by West that when Melvin went to Miami Beach, with West's acquiescence, and made the oral promise to Buchanan to reduce the price of the property from $3,500,000 to $2,900,000 and to allow Buchanan until 2 o'clock the following day to ascertain from his associates whether or not they would be interested in buying the property at the new price, West thereupon became entitled to his commission, because, in contemplation of law, he became "the first broker to sell, because he fully performed his contract to sell when (Melvin) took over and made the oral agreement with Buchanan." To support his contention, he relies upon what is said in Knowles v. Henderson, supra, to the effect that where a broker employed to sell property finds a purchaser who is ready, able and willing to buy at terms fixed by the seller, but before he can effect the sale or procure a binding contract of purchase the seller arbitrarily refuses to go through with the transaction, the broker will be entitled to his commission, *161 if the purchaser remains ready, able and willing to buy at the terms fixed.
We fail to see how the facts of the case at bar bring the case within the exception stated in Knowles v. Henderson, supra.
It is perfectly plain that when Melvin went to Miami Beach to confer directly with Buchanan and thereby attempt "to save the deal," West had not become entitled to a commission, because he had not found a purchaser who was ready, able and willing to purchase the property at the price demanded by Melvin. Since Buchanan and his associates had flatly refused to buy the property at $3,500,000 and Melvin had rejected Buchanan's counter offer of $2,750,000, the most that can be said for West's legal position at the time was that he had three possible prospects, one of whom was willing to confer further about the property but had no power to bind his associates beyond the counter offer that had already been made and rejected.
It is equally plain that since West had utterly failed to perform his non-exclusive oral contract within the terms of his listing, Melvin was not legally obligated to West to negotiate with Buchanan, at the conference, in any particular manner, except to refrain from entering into an arrangement with West's prospects for the purpose of fraudulently preventing West from earning a commission.
So far as can be ascertained from the record, nothing was said or done by Melvin throughout his conference with Buchanan that could be deemed a waiver of the terms of West's original brokerage contract, or that would have, or could have, prevented West from becoming entitled to a commission if a sale had been made to his prospects at the new purchase price, prior to the time some other broker had effected a sale of the property within the terms of his listing. For, as has already been stated, when the conference ended between Melvin and Buchanan no sale had been made of the property. Melvin had orally promised to reduce the purchase price of the property from $3,500,000 to $2,900,000  which Buchanan had been unable to accept because he had no authority from his associates to do so  and had given Buchanan until 2 o'clock the following afternoon to ascertain from his associates whether or not they were interested in purchasing the property at the reduced purchase price.
Even though the oral promise made by Melvin to extend the time for Buchanan to talk with his associates was not enforceable as an option, since no consideration was given for the promise, Donahue v. Davis, Fla., 68 So.2d 163, it is impossible to understand how, if West had been negotiating with Buchanan, in place of Melvin, he could have accomplished as much as, or more than, was accomplished by Melvin in an effort to effectuate a sale. Manifestly, West could not have lawfully made the concession as to price that was made by Melvin, since he had no authority, in respect to price, except to offer the property for sale at $3,500,000  a figure that had already been presented to Buchanan and rejected by him. And, assuming for the sake of argument, that West had been given authority, prior to the conference, to make concessions in regard to price and terms and thereby bind Melvin, it is plain that Buchanan could not have accepted a single concession on behalf of his associates, since at the time of the conference he had no authority to bind his associates beyond the amount of the counter offer of $2,750,000, that had already been made to, and turned down by, Melvin.
Consequently, when the conference between Melvin and Buchanan ended, West occupied no weaker position, because of anything said or done by Melvin during the conference, than he had occupied prior to that time; indeed, it appears that he was in a stronger position. Before the conference, all that West had were three prospects whom he had been unable to interest in the property at the price and terms fixed by the seller; hence he had failed to fulfill the terms of his non-exclusive contract. After the conference, West not only *162 still had his three prospects but also had, in effect, an oral non-exclusive contract to sell that authorized him to sell the property to Buchanan and his associates for $2,900,000 (while other brokers had to sell, under the terms of their contracts, for $3,500,000) provided, of course, he actually effected a sale of the property or procured a binding contract of purchase, prior to the time some other broker did, and provided the sale was effected prior to the time the gratuitous offer to sell the property at the reduced price terminated or was lawfully withdrawn by the seller.
As we have already stated, Harris, who also had a non-exclusive contract to sell the property on a "first come first served" basis, called Melvin not later than 9 o'clock on Friday morning March 16, 1956, to inform him that he had sold the property at the fixed price of $3,500,000; and at 10:10 on the same morning Harris introduced his purchasers to Melvin. All of this occurred more than an hour before Buchanan advised West that he and his associates were willing to buy the property and hence occurred prior to the time that West could have notified Melvin of the fact, even if the latter had chosen to remain at home throughout the whole of Friday morning. The contract of sale was executed by the seller and the purchasers produced by Harris at 2:45 or 3:00 o'clock Friday afternoon. As a matter of law, the execution of this contract terminated all non-exclusive brokerage contracts that were then outstanding. 12 C.J.S. Brokers § 16, p. 47.
We find nothing in the oral concessions made by Melvin at the conference that could be construed as an agreement on his part to pay West a commission regardless of whether a sale was made in the meantime by some other broker; nor was there anything said or done by Melvin to indicate that Melvin intended to give West an exclusive agency to sell the property at the new price stated at the conference.
We conclude, therefore, that the trial court erred in giving judgment to the plaintiff; and consequently, that the judgment should be reversed and the cause remanded for further proceedings according to law.
The conclusions we have reached makes it unnecessary for us to consider the second point urged for reversal by the appellant.
Reversed.
ALLEN, Acting Chief Judge, and SHANNON, J., concur.