THE DILL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 66217. Filed October 30, 1959.

*Logan Morris, Esq.*, for the petitioner.
*Chris J. Ray, Esq.*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined a deficiency in income tax for the year 1954 in the amount of $13,000.

The only issue is whether the amount of $50,000 received by petitioner in 1954 pursuant to the terms of an agreement whereby it granted an extension of a license with option to purchase to its licensee, was includible in its income for that year.

#### FINDINGS OF FACT.

Some of the facts are stipulated, are so found, and are incorporated herein by this reference.

At all times material hereto, the Dill Company (hereinafter referred to as the petitioner) was a Pennsylvania corporation with its principal place of business located at Norristown, Pennsylvania. It filed its Federal income tax return on an accrual basis for the calendar year 1954 with the district director of internal revenue at Philadelphia.

On April 18, 1949, petitioner entered into an agreement with Eastco Laboratories, Inc., whereby it granted Eastco a license to use the trademark "Espotabs," and to manufacture and sell the product made under that trademark for a period of 5 years commencing May 1, 1949, in consideration of the payment of royalties equal to 10 per cent of the net sales price derived on its sale. It was further provided, should the license be in force as of April 30, 1954, that Eastco was to have the right and option either:

(a) To purchase as of the close of business on said day at a purchase price of $350,000, all of Licensor's right, title, and interest in and to said trademark Espotabs including the label and dress of said distinctive package used

in connection therewith, and to the product heretofore manufactured and sold by it under said trade-mark Espotabs and to all rights appurtenant thereto including whatever rights it may have in the trade-mark Espotabs and to the formulae and all other information which it may have relating to the manufacture and sale of the product sold under the trade-mark Espotabs and that part of the good will of Licensor's business connected with the use of, and symbolized by, said trade-mark Espotabs; election to exercise which right and option to purchase shall be made by Licensee giving to Licensor a written notice of its election to exercise such right and option and paying the said purchase price to Licensor on or before said April 30, 1954; or

(b) To extend the term of this license until April 30, 1959, upon the same terms and conditions so far as applicable, by Licensee giving to Licensor written notice of its election to exercise such right and option and by paying to the Licensor $50,000 on or before said April 30, 1954 in addition to any royalties which may be then payable.

If the term of this license shall be extended pursuant to the foregoing provision, then Licensee shall have the right and option to purchase as of the close of business of any calendar month thereafter during such extended term at a price of $300,000 all of Licensor's right, title, and interest in and to said trade-mark and in and to all of the other property and rights appertaining thereto and described in paragraph (a) of this section; election to exercise which right and option to purchase shall be made by Licensee giving to Licensor a written notice of its election to exercise such right and option and paying the said purchase price of $300,000 to Licensor on or before the effective date specified in such notice of election.

In 1952, Eastco's name was changed to Espotabs Corporation, and on April 27, 1954, that corporation exercised its right under the license agreement to extend its term for a further 5-year period ending April 30, 1959. Petitioner was duly notified of this election by a letter from Ivan D. Combs, president of the Espotabs Corporation, wherein he wrote:

We hereby give you notice of our election to extend the term of our license agreement until April 30, 1959 under the provision of paragraph (b) on page 9 of that agreement. We enclose our certified check in the amount of $50,000.

On April 28, 1954, Russell M. Troutman, petitioner's president, acknowledged receipt of Combs's letter and the enclosed check. The next day Troutman directed a letter to the Espotabs Corporation, wherein he stated:

This will acknowledge receipt of your check for the amount of $50,000.00 in accordance with Paragraph (B) on page 9 of the Espotab License agreement.

Having elected to extend the License Agreement until April 30, 1959, we wish you every success in promoting the sale of Espotabs.

On its books, petitioner recorded receipt of the $50,000 payment in the following manner:

|  | Debit | Credit |
|---|---|---|
| Cash—General Account | $50,000.00 | |
| Profit and Loss | | $50,000.00 |

Amount received from Espotabs Corporation to extend term of license agreement until April 30, 1959.

This journal entry was recorded under the date of April 29, 1954.

Throughout the negotiations leading up to the execution of the license agreement the purchase price of the trademark was thoroughly discussed and it was finally agreed upon as $350,000. During these negotiations it became apparent that the licensee desired a somewhat longer term than 5 years within which to determine the advisability of purchasing the trademark. It was then agreed that the term of the license could be extended from 5 to 10 years on the same royalty basis, if, at the end of the 5-year period, $50,000 was paid the licensor; and it was agreed that the purchase price under the option would be $300,000. It was the understanding of the parties that the $50,000 would not have to be returned to the licensee, whether the option to purchase was exercised or not.

Royalties under the agreement were payable semiannually. A minimum royalty of $25,000 was provided for the period from May 1, 1949, to April 30, 1950. Thereafter, during the original or extended term of the license agreement, a minimum annual royalty of $20,000 was provided.

On its Federal income tax return for the calendar year 1954, petitioner reported the receipt of the $50,000 as a long-term capital gain realized from the sale of a trademark, which had a zero basis.

The Commissioner determined that upon receipt of the $50,000 in 1954, petitioner realized ordinary income taxable in that year and accordingly determined a deficiency in tax.

OPINION.

Petitioner now contends it erroneously included the $50,000 payment in its tax return for the taxable year 1954. It argues that the $50,000 was received by it in that year, not as a royalty, not in consideration for the extension of the license agreement, but rather as part of the purchase price of the trademark "Espotabs" in the event the option to purchase should be exercised. Thus, it concludes that the $50,000 is not includible in its gross income until the option to purchase is either exercised or lapses, inasmuch as the taxable character of the payment, i.e., capital gain or ordinary income, cannot be determined until that time. See *Virginia Iron Coal & Coke Co.*, 37 B.T.A. 195 (1938), affd. 99 F. 2d 919 (C.A. 4, 1938), certiorari denied 307 U.S. 630 (1939).

The Commissioner, on the other hand, contends that the record clearly indicates that the $50,000 was bargained for and was paid to petitioner in consideration for the extension of the license agreement and thus was taxable to it in 1954 as ordinary income. Further, assuming the payment to have been for the dual purpose of acquiring an extension of the agreement, as well as to be applied against the purchase price of the trademark in the event the option to purchase was exercised, respondent argues it was received by petitioner in 1954

under a claim of right without restriction as to its use, and therefore represented ordinary income taxable in the year of receipt. *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417 (1932); *Gilken Corporation* v. *Commissioner*, 176 F. 2d 141 (C.A. 6, 1949), affirming 10 T.C. 445 (1948).

Though the facts, so far as they go, are not too complicated, this proceeding presents a relatively difficult issue for resolution. On the one hand it appears the $50,000 was paid in consideration for a 5-year extension of the license agreement; and yet, on the other, it seems clear that the payment was also intended to reduce or be applied against the agreed purchase price in the event the option to purchase was exercised.

As we view it, we must first determine what function the $50,000 was intended to perform. Subparagraph (b) of paragraph 6 of the license agreement expressly gave the licensee the right—

To extend the term of this license until April 30, 1959 * * * by Licensee giving to Licensor written notice of its election to exercise such right and option *and by paying to the Licensor $50,000 on or before said April 30, 1954 in addition to any royalties which may be then payable.* [Emphasis supplied.]

The president of the Espotabs Corporation, appearing for respondent, testified that his interpretation of this portion of the agreement was that the $50,000 was paid for the privilege of extending the license agreement for another 5-year term. Thus it appears that at least one of the parties to the agreement looked upon the $50,000 as consideration for the extension of the license agreement.

On the other hand, there exists adequate support for the petitioner's position that the parties intended that the $50,000 be credited on the purchase price, should the option to purchase subsequently be exercised. We are of the opinion that the agreement as a whole clearly indicates that a purchase price of $350,000 was contracted for; and that this price was applicable, not only at the end of the initial 5-year term, but also throughout the extended term of the agreement. True, as respondent contends, the contractual language does not expressly provide for a credit of the $50,000 against the purchase price. The agreement provides that "[i]f the term of this license shall be extended * * * then Licensee shall have the right and option to purchase * * * during such extended term at a price of $300,000.00." However, we believe that this language implies a tacit understanding that the $50,000 was to be credited on the originally agreed purchase price of $350,000, especially when it is read in light of the agreement as a whole. Moreover, petitioner presented two witnesses, both of whom had been present throughout the negotiations which culminated in the agreement. These witnesses testified that it was understood that while payment of the $50,000 was a

condition precedent to the extension of the license agreement, it was also agreed that it was to be credited against the $350,000 purchase price in the event the option to purchase was exercised.

In the light of these and other facts of record, we are of the opinion that the $50,000 payment was intended to serve both as consideration for the extension of the agreement, and as a payment on account of the purchase price should the option to purchase be exercised.

The next problem is which of these purposes determines the year in which the $50,000 should be included in petitioner's gross income. The Commissioner correctly asserts that the funds were received in 1954 under a claim of right with no restriction upon their use. However, petitioner is equally correct in stating that the character of the funds, whether ordinary income or a capital gain, cannot be determined until the option is either exercised or lapses. This latter factor we believe brings this case within the rule established in *Virginia Iron Coal & Coke Co.*, *supra*. There, payments were received in 1930 and 1931 under an option to purchase stock, it being provided that they were to be applied upon the purchase price should the option be exercised, but were to be retained by the seller in the event of nonexercise. This tribunal held that these payments did not constitute income until the year in which the option to purchase was surrendered. In reaching that conclusion it stated, beginning at 37 B.T.A. 198:

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. * * *

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. Although they were received without any obligation to return them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised. That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. * * *

Inasmuch as we have concluded that the $50,000 was intended as a credit on the purchase price of the trademark, in the event the option to purchase was exercised by the licensee, we are of the opinion that its character could not be determined until either the option to purchase was exercised or lapsed; and therefore, under the line of reasoning alluded to above, the $50,000 is not includible in petitioner's income until that time.

It is immaterial to this case that the basis of the trademark to petitioner was zero and thus that any purchase price received would constitute taxable gain. The taxable year before us is 1954 and in that year it was impossible to determine whether the payment would represent ordinary income taxable in full, or a capital gain taxable only to the extent provided by the statute. See *Hunter* v. *Commissioner*, 140 F. 2d 954 (C.A. 5, 1944), affirming a Memorandum Opinion of this Court.

*Gilken Corporation* v. *Commissioner*, *supra*, is distinguishable, inasmuch as the issue there was whether the initial payments constituted rent or purchase price, with no issue being raised as to the tax character of the payments. Confronted with the facts of that proceeding, both this Court and the Court of Appeals, agreed with the Commissioner that the payments were primarily intended as rent in the year of payment and that that was controlling. Thus they were held taxable in the year of receipt.

We hold for the petitioner.

*Decision will be entered under Rule 50.*