CARL E. KOCH AND PAULA KOCH, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8953–74.   Filed October 19, 1976.

*Michel G. Emmanuel* and *James O. Fergeson, Jr.,* for the petitioners.

*Robert J. Shilliday, Jr.,* for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1964 through 1971 in the amounts as follows:

| TYE Dec.31— | Deficiency | TYE Dec.31— | Deficiency |
|---|---|---|---|
| 1964 | $22,807.60 | 1968 | $20,007.00 |
| 1965 | 22,887.00 | 1969 | 42,352.44 |
| 1966 | 27,897.00 | 1970 | 105,857.60 |
| 1967 | 6,625.00 | 1971 | 344,620.85 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only whether amounts paid to petitioners in the years 1970 and 1971, pursuant to agreements previously entered into, were taxable as ordinary income either as being in the nature of interest or being for 3-month options which expired during the respective years or because they were option payments which were not to serve as a reduction of the purchase price of the property if the option were exercised.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, who resided at the time of the filing of the petition in this case in Fort Lauderdale, Fla., filed joint Federal income tax returns for the calendar years 1964, 1965, 1966, 1967, and 1968 and amended returns for

1967 and 1968 with the District Director of Internal Revenue, Chicago, Ill. They filed joint Federal income tax returns for the calendar years 1969, 1970, and 1971 with the Director, Southeast Service Center, Chamblee, Ga.

Carl E. Koch (hereinafter referred to as petitioner), in 1943, sold a business which he had been operating in Chicago, Ill., and moved to Clearwater, Pinellas County, Fla. After moving to Florida, he became interested in real estate in Pinellas County. During the years 1948 and 1949 he invested most of the proceeds he had received from the sale of his business in lots located throughout Pinellas County. In addition, he sold a controlling interest which he owned in LaSalle Extension University and invested the proceeds of that sale in Pinellas County real estate. Some of the land which petitioner purchased was property which was put up for sale because of nonpayment of taxes by the then owner and other portions of the land were purchased from individuals.

In the early part of 1969 a realtor from Tarpon Springs, Fla., called on petitioner and told him that he knew an individual who might be interested in buying all of petitioner's property. Thereafter the realtor arranged a meeting between petitioner and the individual he referred to who was the owner of Sunlife Development Co., Inc. (hereinafter referred to as Sunlife). After some negotiations, on June 30, 1969, petitioner entered into an agreement which provided for an outright sale of certain property in Pinellas County, Fla., to Sunlife. This agreement further provided in part as follows:

12. *Option.* As an integral part of the consideration for PURCHASER entering into this agreement, SELLER hereby grants to PURCHASER the option to purchase any and all lands owned by SELLER in Pinellas County, Florida as well as certain lands owned and described as follows: * * * * * *

14. *Method of Exercise of Option.* It is expressly understood and agreed the option herein contained may be exercised either in whole or in part from time to time. By exercising the option in whole, the total purchase price shall be a maximum of $17,250,000.00. By exercising the option in part, each platted lot shall be based upon a purchase price of $1,500.00 and all lands not platted in lots shall be based upon $5,000.00 per acre with the exception of a parcel of land consisting of approximately one hundred ten (110) acres located at Palmetto Point in Tarpon Springs, which is to be based upon $8,000.00 per acre, and a golf course owned by Glen Oaks Golf Club, Inc., containing approximately 32 acres, which shall be based upon a price of $2,500,000.00. The golf course shall be represented by all of the

stock of the corporation above named. If the option is exercised in part from time to time, upon the purchase of property aggregating a purchase price of $17,250,000.00, the balance of property covered hereby, if any, shall be conveyed to PURCHASER without payment of any further consideration therefor.

With the exception of the golf course the exercise of the options, either in whole or in part, shall be by written notice to SELLER stating that the PURCHASER is exercising such option, and simultaneously with such notice PURCHASER shall deliver to SELLER a check representing one (1%) percent of the total cost of the lands for which the option is being exercised. Upon such option being exercised SELLER shall within thirty (30) days from the date thereof deliver an abstract to and plats of the platted lots and an abstract and boundary surveys of the unplatted land brought to date and certified to the PURCHASER, showing the SELLER'S title to be good, marketable and insurable, and in the event such abstracts, plats and surveys are not delivered within said time, Seller hereby authorizes the Purchaser to have abstracts and surveys made at Seller's expense. * * *

15. *Credit Against Total Price.* In all instances where the option is exercised in part, the purchase price in each instance shall be credited toward the total option price of $17,250,000.00 above provided, provided however, that where the purchase price in any instance has been reduced by reason of Seller's inability to convey title as required, such decreased amount shall decrease the total option price of $17,250,000.00.

16. *Payment of Option Purchase Price.* As each parcel of Land is purchased under the option provision above provided, Purchaser shall pay Twenty-Five (25%) percent of the purchase price at the time of closing of which the One (1%) percent shall be deemed a part and the balance shall be represented by a promissory note secured by a mortgage payable as follows:
* * *

* * *

18. *Continuation of Option Period.* The option contained in this agreement shall continue for a period of five (5) years and provided Purchaser shall pay to Seller on a quarter annual basis (every three (3) months) starting the 1st day of October, 1969, an amount equal to One and One half (1½%) percent of $17,250,000.00 less the purchase price of any lands sold under the option portion of this agreement. The determination as to the amount to be paid with each quarter annual payment shall be based upon the $17,250,000.00 less all of the purchases made under the option provision of this agreement to the date of each of such quarter annual payment. Anything contained in this paragraph to the contrary notwithstanding the One and One half percent (1½%) referred to above shall be only 0.75% for the first four quarter-annual payments hereunder, and in case there is less than $17,250,000.00 worth of property based upon the option prices set forth herein, the above figure of $17,250,000.00 shall be reduced accordingly.

A few months after executing the agreement above set forth, the officer of Sunlife who was dealing with petitioner decided that the corporation would be unable to purchase all

the real estate referred to in the agreement and wanted to select certain parcels of real estate to purchase, maintaining the same purchase price per acre as was called for in the June 30, 1969, agreement. Petitioner objected to the selections because, in his view, the parcels selected were the choice parcels. As a consequence of negotiations between petitioner and the other party to the agreement, the agreement was amended first on September 30, 1969, and again on December 16, 1969.

The amendment of September 30, 1969, provided in part for the following changes:

Paragraph 14 is hereby deleted and the following shall replace said deleted paragraph:

"14. *Method of Exercise of Option.* It is expressly understood and agreed the option herein contained may be exercised either in whole or in part from time to time. By exercising the option in whole, the total purchase price shall be a maximum of $11,311,250.00. By exercising the option in part, each platted lot shall be based upon a purchase price of $1,500.00 and all lands not platted in lots shall be based upon $5,000.00 per acre with the exception of a parcel of land consisting of approximately one hundred ten (110) acres located at Palmetto Point, in Tarpon Springs, which is to be based upon $8,000.00 per acre. If the option is exercised in part from time to time, upon the purchase of property aggregating a purchase price of $11,311,250.00 less the option price of any lands released from this Agreement by Purchaser, the balance of property covered hereby, if any, shall be conveyed to Purchaser without payment of any further consideration therefor.

"The exercise of the options, either in whole or in part, shall be by written notice to SELLER stating that the PURCHASER is exercising such option, and simultaneously with such notice PURCHASER shall deliver to SELLER a check representing one (1%) percent of the total cost of the lands for which the option is being exercised. Upon such option being exercised SELLER shall within thirty (30) days from the date thereof deliver an abstract to and plats of platted lots and an abstract and boundary surveys of the unplatted land brought to date and certified to the PURCHASER, showing the SELLER'S title to be good, marketable and insurable, and in the event such abstracts, plats and surveys are not delivered within said time, SELLER hereby authorizes the PURCHASER to have abstracts and surveys made at SELLER'S expense. * * *."

Paragraph 15 is hereby deleted and the following shall replace said deleted paragraph:

"15. *Credit Against Total Price.* In all instances where the option is exercised in part, the purchase price in each instance shall be credited toward the total option price of $11,311,250.00 above provided, provided however, that where the purchase price in any instance has been reduced

by reason of Seller's inability to convey title as required, such decreased amount shall decrease the total option price of $11,311,250.00."

Paragraph 18 is hereby deleted and the following shall replace said deleted paragraph:

"18. *Continuation of Option Period.* The option contained in this agreement shall continue for a period of five (5) years and provided Purchaser shall pay to Seller on a quarter annual basis (every three (3) months) starting the 31st day of October, 1969, an amount equal to One and One half (1½%) percent of $11,311,250.00 less the purchase price of any lands sold under the option portion of this agreement and less the option price of any lands released from this agreement by Purchaser. The determination as to the amount to be paid with each quarter annual payment shall be based upon the total option price of $11,311,250.00 less all of the purchases made under the option provision of this agreement and less the option price of all land released from this agreement to the date of each of such quarter annual payment. Anything contained in this paragraph to the contrary notwithstanding the One and One half percent (1½%) referred to above shall be only 0.75% for the first four quarter-annual payments hereunder, and in case there is less than $11,311,250.00 worth of property based upon the option price set forth herein, the above figure of $11,311,250.00 shall be reduced accordingly."

On December 16, 1969, the agreement entered into on June 30, 1969, was amended to extend the closing date for the property sold under the June 30, 1969, agreement to January 31, 1971, and to provide that, notwithstanding anything contained in the June 30, 1969, contract as amended, the purchaser could not exercise to buy less than the whole of certain parcels referred to as parcels 1 through 7, 8(a) and 8(b), 9(a) and 16 as shown on a specified map, and that the purchaser could not exercise its rights to buy less than the whole of the 110 acres of the Palmetto Point property in Tarpon Springs.

Finally, on December 17, 1969, the parties entered into 11 separate agreements which were identical except for references to different properties and different prices. These agreements covered properties referred to as parcels 2, 5, 6, 7, and 8A, 8B, 9, 10A, 10B, 10C, 10D, and the 110 acres of Tarpon Springs Point. Each of these agreements provided in part as follows:

WHEREAS, the parties hereto have heretofore entered into an agreement dated the 30th day of June, 1969, with respect to the sale and granting of options of properties of party of the first part, and

WHEREAS, said agreement of June 30, 1969, was amended by agreements dated September 30, 1969, and December 16, 1969, and

WHEREAS, the parties hereto for their mutual benefit have decided to prepare separate option agreements for certain of the lands which are the subject of the aforementioned agreement and amendment thereto but which are each hereby made independent of said agreement and amendment thereto notwithstanding the incorporation by reference herein of terms, conditions and provisions therein. This option agreement is also independent of all other option agreements.

Now, THEREFORE, in consideration of the mutual benefits and advantages to each of the parties to said agreement and in further consideration of the sum of One Dollar ($1.00) in hand paid by the PURCHASER to the SELLER, the receipt and sufficiency of which is hereby acknowledged, it is agreed by and between the PURCHASER and SELLER as follows:

1. SELLER hereby grants unto PURCHASER the right and option to purchase the following described lands all upon the terms and conditions hereinafter set forth:
* * *
and this land shall only be purchased as a whole.

2. As respects the lands which are the subject of this option agreement, same are hereby excluded from the option portion of the above referred to agreement of June 30, 1969, and amendments thereto.

3. This option shall continue from the date hereof for a period of five (5) years, provided that a payment of 3% of the purchase price for the first year and a payment of 6% of the purchase price for each year thereafter will be paid quarterly (every 3 months ¼ of the annual payment) starting January 31, 1970. * * * Such payments to be paid on or before due dates to the SELLER'S attorneys, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., at Tampa, Florida.

4. All terms, conditions and provisions of the aforementioned agreement of June 30, 1969 and amendments thereto which previously applied to the lands which are the subject of this agreement are expressly incorporated herein by reference except as same are expressly modified or changed by this agreement.

On June 30, 1971, petitioner entered into an agreement with Imperial Land Corp. (hereinafter Imperial) which provided in part as follows:

OPTIONOR hereby gives and grants to OPTIONEE an exclusive and irrevocable option to purchase the land described in EXHIBIT "A" attached hereto and made a part hereof, for the sum of Six Hundred Forty Thousand and no/100 Dollars ($640,000.00) upon the terms and conditions herein set forth.

1. *Option Period.* This Option shall remain in effect for a period of three (3) years from the date hereof and may be exercised at any time during said three (3) year period in the following manner:
By giving written notice to OPTIONOR of its election to buy, such notice to be mailed by Registered or Certified Mail to the following address:
* * *

2. *Option Consideration.* As consideration for this Option Agreement, the OPTIONEE agrees to pay to the OPTIONOR quarter-annually, beginning on the date hereof, the sum of Nine Thousand Six Hundred and no/100 Dollars ($9,600.00). Such payments may be paid in cash or by check of the OPTIONEE made payable to the OPTIONOR and mailed or delivered to: * * * Upon default of OPTIONEE in making any of said quarter-annual payments for a period of ten (10) days after notice of default is served upon OPTIONEE by Registered or Certified Mail, this Option Agreement shall automatically terminate and the parties hereto shall thereupon be released and relieved from all further obligations hereunder. Payment in the manner set forth above within said ten (10) day period shall relieve the default.

Option money paid to keep the option in effect shall not be applied on the purchase price if the option is exercised.
* * *

5. *Payment of Purchase Price.* OPTIONEE shall pay twenty-nine percent (29%) of the purchase price in cash or by valid check at the time of closing of the sale and the balance shall be evidenced by a promissory note of the OPTIONEE, secured by a purchase money mortgage on the property covered hereby, payable in three (3) equal annual installments, plus interest at the rate of six percent (6%) per annum payable annually on the unpaid balance of principal from time to time until the purchase price is paid in full. The first annual payment of principal and interest shall be payable one (1) year after the date of closing of the sale. The note and mortgage shall give full prepayment privileges to the mortgagor, without penalty, at any time after the first year following the date of closing.

On September 17, 1971, petitioner entered into an agreement with Sunlife which made reference to the agreement of June 30, 1969, as amended by agreements dated September 30, 1969, and December 16, 1969, and to the following separate agreements entered into on December 17, 1969, and then recited that the present agreement was independent of all the other agreements. This agreement provided in part as follows:

1. SELLER hereby grants unto PURCHASER the right and option to purchase the following described lands all upon the terms and conditions hereinafter set forth: * * * The purchase price of the above described land is Five Thousand Dollars ($5,000.00) per acre. Subject to the final number of acres that will be certified by boundary survey, the price is 90 × $5,000 = $450,000.00, and this land shall only be purchased as a whole.

2. As respects the lands which are the subject of this option agreement, same are hereby excluded from the option portion of the above referred to agreement of June 30, 1969, and amendments thereto.

3. This option shall continue from the date hereof for a period ending December 17, 1974. As consideration for this option, the PURCHASER agrees to pay to SELLER Three Thousand Three Hundred Seventy-five

Dollars ($3,375.00) on October 30, 1971, and agrees to pay the sum of Six Thousand Seven Hundred Fifty Dollars ($6,750.00) in quarter-annual payments commencing October 30, 1971 and continuing thereafter until this option is exercised or terminates as above provided. Therefore, the amount of the payment due October 30, 1971 shall be a total of Ten Thousand One Hundred Twenty-five Dollars ($10,125.00) and the quarter-annual payments thereafter shall be Six Thousand Seven Hundred Fifty Dollars ($6,750.00). Such payments shall be paid on or before the due dates to the SELLER'S attorneys, CARLTON, FIELDS, WARD, EMMANUEL, SMITH & CUTLER, P.A., at Tampa, Florida.

4. All terms, conditions and provisions of the aforementioned agreement of June 30, 1969 and amendments thereto which previously applied to the lands which are the subject of this agreement are expressly incorporated herein by reference except as same are expressly modified or changed by this agreement.

* * *

6. Said contract of June 30, 1969, and as amended on September 30, 1969 and December 16, 1969, and thereafter and as further modified and amended by this agreement, is hereby ratified and confirmed by the parties hereto and the same shall inure to the benefit of and be binding upon said parties, their heirs, legal representatives and assigns respectively.

On April 20, 1972, Sunlife assigned its interest with respect to 1,000 lots covered by the agreement of June 30, 1969, to Fred C. Howard.

The following schedule shows the total payments received by petitioner under the contracts heretofore in part set forth during the years 1970 and 1971 broken down with respect to specific properties:

|  | 1970 | 1971 |
|---|---|---|
| 1,000 Tarpon Springs lots | $45,000.00 | $90,000 |
| 7 and 8A | 33,000.00 | 66,000 |
| 10D | 24,000.00 | 48,000 |
| 2 | 12,000.00 | 24,000 |
| 5 | 1,500.00 | 3,000 |
| 6 | 24,000.00 | 48,000 |
| 8B | 12,000.00 | 24,000 |
| 9 | 2,100.00 | 4,200 |
| 10A | 2,850.00 | 5,700 |
| 10B | 2,700.00 | 5,400 |
| 10C | 5,700.00 | 0 |
| 16 | 33.75 | 0 |
| 110 acres Tarpon Springs Point | 26,400.00 | 52,800 |
| 90 acres Tarpon Springs | 0 | 10,250 |
| 1 | 0 | 19,200 |
|  | 191,283.75 | 400,550 |

The options covering parcels 5, 6, 7, and 8A, 8B, 9, 10A, 10B, 10D, and the 110 acres of Tarpon Springs Point were

exercised by Sunlife during 1972 and the option covering parcel 1 was exercised by Imperial during 1972. The option covering parcel 16 lapsed in 1970, and the option covering parcel 10C lapsed in 1971. The options on the 1,000 lots at Tarpon Springs and the 90 acres of Tarpon Springs property were either exercised or allowed to lapse sometime after 1972.

Petitioners on their Federal income tax returns for the calendar years 1970 and 1971, did not include in income payments received under the agreements with respect to petitioners' land, including the amounts received with respect to parcel 16 on which the option lapsed in 1970 and parcel 10C on which it lapsed in 1971.

Respondent in his notice of deficiency increased petitioners' income as reported by the amounts of $191,283.75 in 1970 and $400,550 in 1971, which he referred to as "contract payments." He explained the adjustment as follows:

It has been determined that taxable income should be increased for the tax years 1970 and 1971 in the amounts of $191,283.75 and $400,550.00, respectively, because such amounts pertain to non-refundable cash payments received by you which constituted compensatory consideration or interest income with respect to certain contracts negotiated by you which granted the other party the right to purchase certain parcels of vacant land in the state of Florida. The payments received did not constitute part of the agreed selling price of the property in question because they were computed on the basis of three to six percent of the agreed selling price. Taxable income is increased accordingly.

OPINION

Respondent at the trial took three positions in support of the adjustment he made in petitioners' taxable income. He first contended that the payments referred to in the agreements were not in fact option payments and were in fact interest payments. Secondly, he contended that even if the payments were option payments, they were for options extending for only 3 months and, therefore, were includable in petitioners' income in the year in which paid because one option lapsed and another was begun with each quarterly payment. Thirdly, he argued that even if the payments were strictly option payments for 5- or 3-year options the amounts of such payments were includable in petitioners' income in the year received since the amounts of the option payments

were not to be used to reduce the otherwise agreed-to purchase price of the land.

At the trial respondent stated that his Revenue Ruling 58–234, 1958–1 C.B. 279,[1] was distinguishable and was not applicable to the present case since that revenue ruling dealt with "put" and "call" stock options and not real estate

---

[1] Rev. Rul. 58–234, 1958–1 C.B. 279, provides in part as follows at page 283:

Usually, the premium paid for either a "put" or a "call," is not, under its terms or otherwise, applicable, if it is exercised, against its option price, but it is sometimes so provided in "call" options. However, it is considered unrealistic to distinguish, for the purpose of determining proper Federal income tax treatment, between an option whereunder the amount of the premium is applicable, in such event, against the option price and one whereunder the amount of the premium is not so applicable, since there is no real difference between them. Their substance is the same, and their formal difference involves merely a different way of stating the (real) option price. For example, a 90-day "call" option granted for a $500 premium to buy certain stock at $10,000 with no provision for applicability of the premium thereagainst in the event of exercise of the option is, in reality and substance insofar as option price is concerned, identical with a 90-day "call" option granted for $500 premium to buy the same stock at $10,500 with the $500 premium paid applicable thereagainst in the event of exercise of the option. The real option price is the same in both options, namely $10,000. The decision in *Virginia Iron, Coal & Coke Co.*, 37 B.T.A. 195, affirmed 99 F. (2d) 919, certiorari denied 307 U.S. 630, is not to the contrary despite certain *dicta* contained in the opinions.

An optionor, by the mere granting of an option to sell ("put"), or buy ("call"), certain property, may not have parted with any physical or tangible assets; but, just as the optionee thereby acquires a right to sell, or buy, certain property at a fixed price during a specified future period or on or before a specified future date, so does the optionor become obligated to accept, or deliver, such property at that price, if the option is exercised. Since the optionor assumes such obligation, which may be burdensome and is continuing until the option is terminated, without exercise, or otherwise, there is no closed transaction nor ascertainable income or gain realized by an optionor upon mere receipt of a premium for granting such an option. The open, rather than closed, status of an unexercised and otherwise unterminated option to buy (in effect a "call") was recognized, for Federal income tax purposes, in *A. E. Hollingsworth v. Commissioner*, 27 B.T.A. 621, acquiescence, C. B. XII-1, 6 (1933). It is manifest, from the nature and consequences of "put" or "call" option premiums and obligations, that there is no Federal income tax incidence on account of either the receipt or the payment of such option premiums, *i.e.*, from the standpoint of either the optionor or the optionee, unless and until the options have been terminated, by failure to exercise, or otherwise, with resultant gain or loss. The optionor, seeking to minimize or conclude the eventual burden of his option obligation, might pay the optionee, as consideration for cancellation of the option, an amount equal to or greater than the premium. Hence, no income, gain, profits, or earnings are derived from the receipt of either a "put" or "call" option premium unless and until the option expires without being exercised, or is terminated upon payment by the optionor of an amount less than the premium. Therefore, it is considered that the principle of the decision in *North American Oil Consolidated v. Burnet*, 286 U.S. 417, Ct. D. 499, C. B. XI-1, 293 (1932), which involved the receipt of "earnings," is not applicable to receipts of premiums on outstanding options.

options. The third argument made by respondent at the trial is not mentioned in respondent's brief. Revenue Ruling 58–234, *supra,* is not mentioned by respondent in either his original or reply brief, although petitioner relied on this ruling at the trial and in his opening brief. After further contending that the payments are interest payments rather than for an option, respondent, in his reply brief, summarizes his only other contention on brief as follows:

> It is respondent's position under *Virginia Iron Coal & Coke Co.* and Treas. Reg. 1.1234–1(b) (as set out on pages 21 - 23 of its opening brief) that since the options terminated every three months, the payments received in 1971 [sic] and 1972 [sic] attributable to lapsed options are taxable in those years as ordinary income.

Respondent, in his first argument, contends that because the payments provided for in the agreement are stated in terms of a percentage of the total purchase price and "because this percentage was at least partially intended to be interest," the payments are in reality interest and taxable in the year of their receipt under section 61(a)(4).[2]

We have quoted in some detail the agreements involved in this case. These agreements are clearly option agreements. As we have pointed out in a number of cases, the clear distinction between an option and a contract of sale is that an option gives a person a right to purchase at a fixed price within a limited period of time but imposes no obligation on the person to do so, whereas a contract of sale contains mutual and reciprocal obligations, the seller being obligated to sell and the purchaser being obligated to buy. *W. A. Drake, Inc.,* 3 T.C. 33, 37 (1944), affd. 145 F.2d 365 (10th Cir. 1944); *Geo. S. Carter,* 36 T.C. 128, 130 (1961). As we stated in *Estate of Charles T. Franklin,* 64 T.C. 752, 763 (1975):

> If an option is not exercised, the optionor becomes entitled to keep only the amount paid as consideration for granting the option (the tax consequences being controlled by section 1234) and has no enforceable right of action against the optionee for damages. *United States Freight Co. v. United States,* 190 Ct. Cl. at 739–740; 422 F.2d at 895.
>
> A contract of sale, in contrast, carries mutual obligations on the part of the seller to sell and the buyer to buy. See *W. A. Drake, Inc. v. Commissioner,* * * *; *Lawler v. Commissioner,* 78 F.2d 567, 568 (9th Cir.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

1935). It "is a contract 'to pass rights of property for money,—which the buyer pays or promises to pay to the seller.' " *Commissioner v. Brown,* 380 U.S. 563, 571 (1965). The purchaser in such a bilateral contract is liable for full contract damages if he fails to perform. *United States Freight Co. v. United States,* * * *. Accordingly, a contract of sale imposes an enforceable obligation to pay the purchase price, which will support interest deductions and give the purchaser a cost basis in the property on which depreciation is allowable.

The agreements here bound petitioner to sell the property to Sunlife during a period of 5 years if the option was kept in force, but did not bind Sunlife to purchase any of the property. Sunlife was privileged to exercise the right to purchase in accordance with the agreement, provided the necessary payments had been made to keep the agreement in full force and effect, but could let any one of the options lapse at any time without exercising the right granted and had no further obligation to petitioner.

Under these facts it is clear that there was no *indebtedness* of Sunlife to petitioner in the ordinary sense of the word. An indebtedness has many times been held by us to be an "existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Sterling G. Howlett,* 56 T.C. 951, 960 (1971). Ordinarily, interest is an amount paid by a person on an indebtedness for the use of, or forbearance to require immediate payment of, a stated sum.

It is true, as respondent points out, that there have been cases in which we have found that, although a contract did not specifically call for interest payments, the terms of the contract as a whole were such that some part of the payments to be made was properly to be considered, for purposes of Federal taxation, as interest payments.

One such case typical of this general type of case is *Judson Mills,* 11 T.C. 25 (1948), cited by respondent. That case involved certain agreements denominated as leases requiring monthly payments which were denominated as rentals of machinery. Under the agreement, at the end of a 5-year period, the lessee was entitled to acquire the machinery for a small additional payment. We concluded in that case that the payments were not rental payments but were payments made by the taxpayer to acquire title to the machinery and that by these payments the taxpayer was acquiring substantial equity ownership of the machinery. We then concluded, based on the

fact that the evidence showed that the parties had arrived at the amount of monthly payment on the basis of a principal amount as the cost of the machinery with an increase for amounts computed to represent interest, that in substance the agreements called for interest payments and that the taxpayer should be sustained in his alternative contention that a portion of the amount was deductible as interest. It is apparent that the factual situation in the *Judson Mills* case is completely different from that in the instant case. Where we have concluded that in substance the payments under an agreement were either for rental or for an option to purchase property we have held that the payments were to be so treated. See *Kitchin v. Commissioner,* 353 F.2d 13 (4th Cir. 1965), affg. a Memorandum Opinion of this Court; *Sterling G. Howlett, supra;* and *Dill Co.,* 33 T.C. 196 (1959), affd. 294 F.2d 291 (3d Cir. 1961).

The case of *Jones v. Commissioner,* 330 F.2d 302 (3d Cir. 1964), remanding 40 T.C. 249 (1963), involved a totally different situation from that involved in the instant case. That case involved an individual who purchased remainder interests, which were contingent on the owners surviving the life tenants, that were sold at a discount by the taxpayer after the death of the life tenants. In our view, that case has no bearing on the problem involved in the instant case.

We do not share respondent's view that because the payments were expressed as a percentage of the purchase price, they should be considered as interest payments. In fact the Imperial Land Co. option was in terms of a fixed amount, but otherwise the same as the other agreements. In our view, the use of a percentage figure for the option payments was merely for convenience since the original agreement provided for exercise of the privilege in part. We conclude that the payments petitioner received under the agreements were in return for the continuing right of the optionee to purchase the property and so were payments for options.

Our concluding that the payments were for the granting of the options does not dispose of this case. Most of the cases dealing with option payments involved contracts which specifically provided for the option payments being used to reduce the stated purchase price if the option were exercised. Under these circumstances, the option price would have no

element of compensation in the nature of interest unless the purchase price itself included such an element. Certainly it is not unrealistic to assume, in case of a long-term option with a stated purchase price, that the purchase price might be fixed to include some element of interest. However, the fact that the payments here were not to reduce the stated purchase price if the option were exercised does not cause them not to be as specifically stated in the agreements, payments for keeping the options effective.

Respondent, in support of his argument that the agreements provided for a series of options each expiring at the end of a 3-month period, relies on *Koplin v. Bennett,* 155 So.2d 568 (Fla. Ct. App. 1963); *Ratner v. Coral Television Corp.,* 139 So.2d 437 (Fla. Ct. App. 1962); and *Melvin v. West,* 107 So.2d 156 (Fla. Ct. App. 1958). None of these cases support respondent's contention. Both *Koplin v. Bennett, supra,* and *Melvin v. West, supra,* hold merely that there must be consideration for an option contract and a mere offer to sell without consideration being paid by the person to whom the offer is made is revocable at any time prior to the acceptance of the offer. *Ratner v. Coral Television Corp., supra,* holds that failure to exercise an option may be waived or the option may be extended by a new contract. None of these cases deals with a situation of an option for a stated period of time with the option lapsing unless periodical payments are made.

In our view, the options here were clearly options for periods of 5 and 3 years and were not a series of 3-month options. The case of *Virginia Iron Coal & Coke Co.,* 37 B.T.A. 195 (1938), affd. 99 F.2d 919 (4th Cir. 1938), involved an option agreement that could be retained for a period of 5 years by a payment of $300,000 on August 1 of the first year and $125,000 on the first day of August in each succeeding year for the 5-year period. In that case, after the first payment of $125,000 the holder of the option permitted it to expire. Thereafter, the holder of the option notified the grantor of the option that the option would not be exercised. We held that the two payments which kept the option in effect were includable in the taxpayer's income in the year in which the option was surrendered.

Even though respondent does not argue on brief that the option payments are includable in petitioner's income in the

year these payments were received because these payments were not to be used to reduce the stated purchase price of the property, he has not specifically waived this contention. We therefore consider this issue to still remain in the case.

In the *Virginia Iron Coal & Coke Co.* case, we stressed that it was impossible to tell when the payments were received whether they would ultimately represent income to the taxpayer or a return of capital. We pointed out that the payments were to be applied against the purchase price in case of the exercise of the option and that, therefore, only upon termination of the option would it be apparent whether the payments represented clear gain to the taxpayer rather than a return of capital. We also stressed the fact that even though the payments were received in the earlier years without any obligations to return them, there was the condition attached to their receipt that they had to be applied against the purchase price in case the option was exercised. We then stated (37 B.T.A. at 199):

That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. Similar cases of forfeiture arise under contracts of sale and are treated the same way. * * *

Insofar as we have been able to determine in other cases involving the treatment of option payments, either the contract has clearly provided that the payment would be offset against the purchase price of the property which was the subject of the option or we have concluded from the contract as a whole that in fact the payment was at least partially a part of the purchase price if the options were exercised.

*Dill Co., supra,* involved a contract whereby the taxpayer granted a license to a corporation to manufacture a product owned by it under a trademark for a stipulated royalty. The license was granted for a period of 5 years with the option to the licensee to purchase the trademark at the end of the 5-year period upon payment of $350,000, or upon payment of $50,000 obtain a 5-year extension of the license agreement with the right at the close of any calendar year during the additional 5-year period to purchase the taxpayer's interest in the trademark for $300,000. In that case we stated (33 T.C. at 199):

On the one hand it appears the $50,000 was paid in consideration for a 5-year extension of the license agreement; and yet, on the other, it seems clear that the payment was also intended to reduce or be applied against the agreed purchase price in the event the option to purchase was exercised.

There was no specific statement in the contract in the *Dill* case that the $50,000 was to be credited on the purchase price of the trademark. In fact, such an inference could be drawn only from the fact that during the second 5-year period the agreed purchase price was reduced by $50,000. We concluded (33 T.C. at 200) that "the $50,000 payment was intended to serve both as consideration for the extension of the agreement, and as a payment on account of the purchase price should the option to purchase be exercised." We therefore held that the character of the $50,000 payment could not be determined until either the option to purchase was exercised or lapsed, relying on *Virginia Iron Coal & Coke Co., supra.* In the *Dill* case we distinguished cases such as *Gilken Corp.,* 10 T.C. 445 (1948), affd. 176 F.2d 141 (6th Cir. 1949), on the ground that such cases involved whether a contract was one of sale or of rental, making it necessary to determine whether a lump sum payment was an initial rental payment or a part of the sales price. See also *Kitchin v. Commissioner, supra.*

In the instant case we have little to turn to other than the provisions of the contracts themselves to determine whether the negotiated purchase price was in fact less than it would have been had the option payments been used as a reduction of that price. If the purchase prices were less than they would have been had the option payments been used to reduce those prices if the option were exercised, then, in effect, the option payments did serve as a reduction of purchase price. Certainly, when an option is granted fixing a purchase price for property for a period of years, it is reasonable that a payment be required to compensate the grantor of the option for the normally to be expected increase in the price of the property under option, since he is obligated to deliver the property at the stated price but the person to whom the option is given is not obligated to purchase the property.[3]

---

[3] In this respect, petitioner testified as follows:

MR. EMMANUEL: In granting him these options, what was your intention with respect to the option period?

A. Well, he insisted on a five year option, in other words, the hind-sight is always better than foresight and looking backwards, I didn't know at that time that the price

Since the grantor of the option has use of the property until the option is exercised, under some circumstances returns from the use of the property while it is under option would serve the function that interest might serve had a sale been made of the property and the property delivered to the purchaser. However, under other circumstances where the property is not income-producing, as apparently was the case here, the only return from the land while held by petitioner was the anticipated increase in its value.

There is no indication in the record in this case that petitioner's land was returning any income. However, presumably some use might have been made of the land while it was still owned by and in possession of petitioner, even though under option. Certainly it might be that the option payments contained some element of compensation for petitioner's being unable to immediately obtain money from the sale of property because of the property being under option. If this is assumed, then the option payments would be for the dual purpose of this form of compensation and for increment in value of the property. This latter purpose would effectively be the same as if the purchase price of property had been fixed to account for such expected increment and the option payments used to reduce that purchase price. Under such circumstances we held in the *Dill* case that the character of payment could not be determined until either the option to purchase was exercised or lapsed.

---

of real estate was going up rapidly, but he insisted on having a five year option. Now if I'd had a one year option, which would have been fine, I could have changed the price of the land each year. I could have raised it according to the market value of it, but I was tied with five years as long as he kept up his payments.

Q. And what were those payments, if you remember?

A. Those were option payments quarterly, the first year was a total of 3% and after that a total of 6%, payable quarterly.

    *   *   *

Q. Do you know how those percentage points were arrived at?

A. Well, that was about a customary amount for an option in this area at that time. But, that was for an annual option, on a five year, it should have perhaps been a little more, but anyway that was the agreement and I saw a prospect of disposing of a large amount of property and—

Q. Were those option payments intended by you to represent interest?

A. I don't see how they could. If I had sold the property and taken back a mortgage, then they would have been interest, but there was no sale of the property, just an option.

Q. Did you consider yourself committed by these options?

A. Well, I was committed.

It might be pointed out that respondent's Revenue Ruling 58–234, *supra* (see n. 1), reaches the conclusion with respect to option payments which are not to be used in reduction of the purchase price that the effect is no different than a higher price for the property reduced by the option payments if the option is exercised.

Of course petitioner incorrectly failed to report the option payments received with respect to those properties where the options expired in the years here in issue. Other than with respect to these option payments, we hold that petitioner was correct in not reporting the option payments in the years here in issue.

*Decision will be entered under Rule 155.*